**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| CHARGELOGIC LLC, <br><br>     Plaintiff, <br><br>     v. <br><br> TESLA, INC., <br><br>     Defendant. | Civil Action No. 7:26-cv-00100 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND**

Plaintiff ChargeLogic LLC, ("ChargeLogic" or "Plaintiff") hereby files its Complaint for

Patent Infringement and Jury Demand against Defendant Tesla, Inc., ("Tesla" or "Defendant").

Plaintiff, on personal knowledge as to their own acts, and on information and belief as to all others

based on investigation, alleges as follows:

**BACKGROUND**

1.      This Complaint asserts causes of action for infringement (including direct, induced,

and joint infringement) of the following United States Patents owned by ChargeLogic: U.S. Patent

Nos. 10,090,567 (the "'567 Patent"), 11,258,107 (the "'107 Patent"), 11,721,844 (the "'844

Patent"), 11,508,996 (the "'996 Patent"), 11,909,010 (the "'010 Patent"), and 11,909,011 (the

"'011 Patent") (collectively, the "Asserted Patents") and states as follows:

**THE PARTIES**

2.      Plaintiff ChargeLogic LLC is a Texas limited liability company with its principal

place of business at 4416 Briarwood Avenue, Midland, Texas 79707-2615.

3.      ChargeLogic is the sole and exclusive owner of all rights, title, and interest to and

in the Asserted Patents and holds the exclusive right to take all actions necessary to enforce its

1

rights to the Asserted Patents, including the right to recover all damages for past, present, and future infringement of the Asserted Patents and to seek injunctive relief as appropriate under the law.

4. Defendant Tesla, Inc. is a Texas corporation and has a physical place of business at 1 Tesla Road, Austin, Texas 78725. Tesla can be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

5. Tesla is a Texas corporation and therefore registered to do business in Texas. Tesla maintains its headquarters in the Western District of Texas in Austin, Texas. Tesla also has other regular and established places of business in the Western District of Texas.

## JURISDICTION AND VENUE

6. This Court has exclusive subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a) on the grounds that this action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285.

7. This Court has both general and specific personal jurisdiction over Tesla. General jurisdiction applies at least because Tesla is "at home" in Texas as both its state of incorporation and state of its principal place of business, including its principal executive offices, are in Texas.[1] This Court also has specific personal jurisdiction over Tesla at least because, among other reasons, Tesla has minimum contacts with Texas and this District such that exercise of jurisdiction over Tesla would not offend the traditional notions of fair play and substantial justice. Venue is also

---

[1] Tesla, Inc., Annual Report (Form 10-K) (Jan. 28, 2026) (*hereinafter* "2025 Annual Report"), https://www.sec.gov/Archives/edgar/data/1318605/000162828026003952/tsla-20251231.htm (listing Texas as state of incorporation and 1 Tesla Road, Austin, Texas as the address of the principal executive offices).

proper in this District pursuant to 28 U.S.C. § 1400(b) because Tesla has regular and established physical places of business in this District and has committed acts of patent infringement in this District.

8.    Tesla has dozens of corporate locations in the State of Texas, including at least 36 "store locations," and maintains numerous regular and established places of business in the Western District of Texas, including Tesla's principal executive office and headquarters at 1 Tesla Road, Austin, Texas 78725, co-located with its "Gigafactory" and facilities:



Tesla Headquarters - Gigafactory Texas

1 Tesla Road
Austin, TX 78725

On information and belief, Tesla also handles engineering, testing, and administrative operations at its Las Cimas, Building II office in Austin, Texas, with the location shown in the Google Maps image below:[2]

---

[2] *See, e.g.*, Connect CRE, *GLL Ends Hold on Las Cimas II and III*, https://www.connectcre.com/stories/gll-ends-hold-las-cimas-ii-and-iii/ (Nov. 6, 2018) (listing Tesla Inc. as a tenant); Austin American Statesman, *2 West Austin Office Buildings Change Hands* (Jul. 17, 2018) https://www.statesman.com/story/business/2018/07/17/2-west-austin-office-buildings-change-hands/10423683007/ (identifying Tesla as a tenant); Reddit, Post & Comments, *Testing This Morning in Las Cimas Office in Austin*, https://www.reddit.com/r/teslamotors/comments/x39c1a/testing_this_morning_in_las_cimas_office_in_austin/ (last visited Mar. 2, 2026); Reddit, Post & Comments, *Commuting to Las Cimas Office Park*, https://www.reddit.com/r/Austin/comments/1hpvq6d/commuting_to_las_cimas_office_park_west_lake/ (last visited Mar. 2, 2026).



In addition, Tesla operates an in-house lithium refinery in the greater Corpus Christi, Texas area; and is building a "Megafactory" at 111 Empire Boulevard in Brookshire, Texas (near Houston).[3] Tesla also publishes multiple other locations within this District, including about ten stores, multiple collision and service centers, approximately two dozen Superchargers, and dozens of destination chargers.[4]

9.      In Travis County alone, within this District, Tesla also maintains billions in appraised value of commercial property and other assets.[5]

10.     In recent patent-infringement actions filed in this District, Tesla has repeatedly conceded or not contested personal jurisdiction.[6]

---

[3] 2025 Annual Report at 7, 33; Tesla, Tesla Lithium Refinery Groundbreaking, https://www.tesla.com/blog/tesla-lithium-refinery-groundbreaking (May 8, 2023).

[4] Tesla, *Find Us*, https://www.tesla.com/findus/list/ (last visited Mar. 2, 2026).

[5] *See, e.g.*, M. Masumoto, *Tesla Faces Potential Lawsuit Over Gigafactory Property Value Dispute*, KVUE, https://www.kvue.com/article/news/local/tesla-potential-lawsuit-1-billion-property-value-appraisal-reduction-gigafactory/269-0d124a1d-7870-4500-8f69-e0e740dd6674 (Aug. 22, 2025); Travis Central Appraisal District, *Property Search*, https://travis.prodigycad.com/property-search (last visited Mar. 2, 2026) (reflecting appraised values totaling over $9 billion in response to compound text search for "Tesla").

[6] *See, e.g.*, Def. Tesla, Inc.'s Partial Mot. to Dismiss, *Graphite Charging Co. v. Tesla, Inc.*, No. 1:23-cv-00925-DAE (W.D. Tex. Nov. 20, 2023), ECF No. 19 (moving to dismiss under Rule

11.     In addition, Tesla has committed acts within this District giving rise to this action, including engaging in the infringing conduct alleged herein, including designing, manufacturing, marketing, testing, and selling the infringing products within this District and inducing from within this District its customers to infringe.

12.     Tesla, directly and including through any subsidiaries or agents, makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets the Accused Products (described further below) within the State of Texas and the Western District of Texas that infringe one or more claims of each of the Asserted Patents. Tesla manufactures in this District, tests in this District, makes in-store and other direct sales to consumers in this District, undertakes marketing and sales operations and strategy in this District, and installs, maintains, and operates charging stations throughout this District.

13.     Tesla has placed or contributed to placing infringing products into the stream of commerce, including at least the Tesla Model 3, Y, S, X, Cybertruck, and Semi, and related devices and/or equipment, with the knowledge and intent that such products would be sold in and purchased and used by customers in the United States, Texas, and this District.

14.     Tesla also offers its Robotaxi service using the Model Y through its app in Austin, Texas, and Tesla plans to release a "purpose-built autonomous vehicle" called Cybercab in Austin

---

12(b)(6) but not for lack of personal jurisdiction); Def. Tesla, Inc.'s Mot. to Dismiss Pl.'s Compl. Pursuant to Rule 12(b)(6) for Failure to State Claims for Indirect Infringement and for Injunctive Relief, *Charge Fusion Techs., LLC v. Tesla, Inc.*, No. 6:21-CV-1078-ADA (W.D. Tex. Jan. 7, 2022), ECF No. 28 (same); Tesla Inc.'s Rule 12(b)(6) Mot. to Dismiss, *Bulletproof Prop. Mgmt. LLC v. Tesla, Inc.*, No. 1:25-cv-665-ADA (W.D. Tex. July 21, 2025), ECF No. 12 (same); Mot. to Dismiss Monument Peak Venture's Claims of Infringement of U.S. Patent No. 7,418,116 under Rule 12(b)(6), *Monument Peak Ventures, LLC v. Tesla, Inc.*, No. 6:23-cv-750-ADA (W.D. Tex. Jan. 16, 2024), ECF No. 10 (same); Def. Tesla, Inc.'s Partial Mot. to Dismiss, *Relink US LLC v. Tesla, Inc.*, No. 1:23-cv-01093-DAE (W.D. Tex. Nov. 20, 2023), ECF No. 10 (same); *see also* Fed. R. Civ. P. 12(h) (describing when defenses are waived).

soon.[7]

15.     Tesla has derived substantial revenues from its infringing acts in this District, including from the making, using, selling, offering for sale, and/or importing of the Accused Products identified below.

16.     Tesla is thus subject to this Court's general and specific jurisdiction, consistent with due process and the Texas Long Arm Statute due at least to Tesla's substantial business in the State of Texas and this District, including through its past and ongoing infringing activities, because Tesla regularly does and solicits business herein, and/or Tesla has engaged in persistent conduct and/or has derived substantial revenues from goods and services provided in the State of Texas and this District.

17.     Venue is likewise proper in this District pursuant to 28 U.S.C. § 1400(b) because Tesla has regular and established physical places of business in this District and has committed acts of patent infringement in the District.

18.     Tesla resides in this District because it is incorporated in this State, has its regular and established place of business (*e.g.*, its headquarters) in this District, and has committed and continues to commit acts of patent infringement in this District by making, using, selling, and offering to sell products that infringe one or more claims of the Asserted Patents.

19.     Because Tesla maintains its headquarters in this District and on information and belief manufactures the Accused Products here (as described below), Tesla also maintains, among other things, marketing materials, information about Tesla's testing and manufacturing, documentation of Tesla's sales and financials related to the Accused Products, and information concerning how the Accused Products work and were developed. On information and belief, such

---

[7] Tesla, *Robotaxi*, https://www.tesla.com/robotaxi (last visited Mar. 8, 2026).

documents and other information are either physically located at Tesla's headquarters in this District or electronically maintained and readily accessible in this District with Tesla's record custodian located at or near Tesla's headquarters in this District.

20.    Tesla also employs tens of thousands of employees at its headquarters and other locations within this District. As of Tesla's most recent report to Travis County, Tesla employed 21,191 individuals in the Austin metro area in 2024.[8] As of March 2026, Tesla had over 600 job postings for jobs based in Texas, including over 400 in Austin, and jobs in Waco, Midland, San Antonio, and elsewhere within this District.[9]  On information and belief, most of Tesla's senior leadership, including its VP of Charging, Chief Financial Officer, and its General Counsel and Corporate Secretary are all located at Tesla's headquarters in this District.

21.    On information and belief, Tesla employs personnel in this District who have and continue to develop, manufacture, and test the Accused Products work in this District—including product engineers, design engineers, testing and test development engineers, and other employees throughout the full product cycle. Tesla has represented to investors that it manufactures and sells vehicles in this District and has been manufacturing them in this District since at least 2021 at its "Gigafactory Texas" location.

22.    In addition to its headquarters and factory within this District, on information and belief, Tesla has sold and delivered vehicles to customers in Midland, opened a store in Midland where it has demonstrated the charging technology and sold vehicles to customers, and installed charging stations in Midland for use by consumers of Tesla vehicles. These infringing products

---

[8] B. Sechler, *Tesla's Local Workforce Has Yet to Rebound from Last Year's Job Cuts*, KXAN, https://www.kxan.com/news/local/austin/teslas-local-workforce-has-yet-to-rebound-from-last-years-job-cuts/ (Apr. 3, 2025).
[9] Tesla, *Build Your Career at Tesla*, https://www.tesla.com/careers/search/?site=US&state=TX (last visited Mar. 2, 2026).

have been and continue to be purchased in this District and this Division.

23.    Tesla has reiterated to its shareholders that Texas—the location of its headquarters, which is in this District—is its home, and that Tesla prefers to have courts, judges, and juries in Texas deciding legal and factual issues in cases involving the company, underscoring Tesla's interest and the local interest in keeping disputes related to Tesla in the local courts—*i.e.*, in this District.[10]

24.    Tesla makes, uses, sells, tests, offers to sell, and imports infringing products into and within this District. Tesla maintains a permanent and continuous presence in this District, has the requisite minimum contacts with this forum, and has transacted—and at the time of the filing of this Complaint continues to transact—business within this District. Thus, jurisdiction and venue are proper and convenient in this forum.

**THE ASSERTED PATENTS**

25.    This complaint asserts causes of action for infringement of the '567 Patent, the '107 Patent, the '844 Patent, the '996 Patent, the '010 Patent, and the '011 Patent.

26.    Each of the Asserted Patents contains claims directed to patent-eligible subject

---

[10] Tesla, Inc., Proxy Statement (Schedule 14A) (Apr. 17, 2024), https://www.sec.gov/Archives/edgar/data/1318605/000110465924048040/tm2326076d13_pre14a.htm, at 4 ("Texas is Tesla's Home. . . . We are asking for your vote to approve Tesla's move from Delaware, our current state of incorporation, to a new legal home in Texas. Texas is already our business home, and we are committed to it."); *id.* at 37 ("Tesla's Home and Future Are in Texas. Tesla is All-In on Texas. The Board believes that our corporate identity is intertwined with our Texas corporate headquarters and that redomiciling in Texas would be consistent with this trajectory. . . . There is Value in Local Decision-Making. Another advantage of home-state incorporation is that the legislators and judges making corporate law – and the juries deciding fact disputes in corporate cases – are drawn from the community in which the company operates. Corporate law and litigation often overlap with and impact business, employment, and operational matters. And Tesla is not a cookie-cutter public company. The Special Committee and the Board believe that local decision-makers have a deeper understanding of our business, and therefore are best situated to make decisions about our corporate governance.").

matter and is a valid and enforceable U.S. patent, the entire right, title, and interest to which ChargeLogic owns by assignment.

27.     One critical problem for an electric vehicle ("EV") consumer is maintaining an adequate charge for the battery. Before EVs were as widespread as they are today, charging stations were not as readily available. An EV consumer must consider, among other issues: the cost of charging the vehicle's battery (which cost may vary at home, in an apartment complex, at work, or at other locations in private or public); the distance required to travel before the next charging session; the time needed to charge the vehicle's battery for the needed "range"; and the status of charging an EV battery over many minutes or hours.

28.     The increasing adoption of EVs also posed broader challenges and resulting pushback and hostility to EVs. For example: during emergencies or periods of high demand, some states have experienced electrical energy shortages that resulted in blackouts or brownouts for residential and commercial users; increased adoption of EVs add to the demand for electrical energy. As another example, EV consumers may tend to arrive and depart their primary charging locations (*e.g.*, at home or work) at common times of day, placing increased demand for electrical energy at peak charging times (*e.g.*, 8:30 a.m. or 6 p.m.).

29.     The Asserted Patents address and solve issues related to these and other concerns and are directed to methods and systems specific to EV charging, including aspects of electric vehicle battery chargers and charging systems. The technology claimed in the Asserted Patents relieves friction associated with widespread adoption of EVs, including "range anxiety" and the logistical complexity of battery charging.

30.     In the early days of EVs, charging was a "dumb" process—an EV user plugged the vehicle in; the charger drew power to charge the battery until the battery was full. This sufficed

for small-battery compliance cars (vehicles produced and sold by automakers primarily to meet regulatory zero-emission mandates such as those set by California, rather than for mass-market sales) but failed to address the needs of modern EV owners dealing with large battery packs, variable electricity rates, and the practical need for charging predictability and visibility during the charging process.

31.    In 2008, the inventor of the Asserted Patents, Christopher Austin, recognized a potential looming problem even though EVs had barely penetrated the auto market. At the time, the Prius hybrid was the most recognized electrified vehicle.[11] Auto manufacturers like General Motors had designed electric vehicles, but they were not widely available.[12] The chart below, previously prepared by the Department of Energy and since memorialized in research papers, shows the Nissan Leaf and Chevrolet Volt reaching consumers in 2010—with limited consumer EV sales (in the low thousands to low tens of thousands) from 2010 to 2014.[13]

---

[11] *See* Dep't of Energy, *Timeline: History of the Electric Car* (visited Mar. 1, 2026), https://www.energy.gov/timeline-history-electric-car.
[12] *Id.*
[13] K. Jhala, *Coordinated Electric Vehicle Charging with Renewable Energy Sources* (Aug. 2015), https://www.researchgate.net/figure/Electric-Vehicle-Sales-4_fig1_326158354 (citing Dep't of Energy image); *see also* Argonne Nat'l Lab., *E-drive Vehicle Sales Analyses* 6 (June 18, 2014), *available at* https://energy.gov/sites/prod/files/2014/07/f17/van011_zhou_2014_o.pdf.



32.    EV charging infrastructure was also virtually nonexistent, with public charging station few and far between.[14]

33.    Before even the limited adoption of EV technologies in 2010 and beyond, Mr. Austin recognized that, to reduce consumer and commercial resistance to EV technology, the vehicle and its charger needed to become an intelligent agent in the charging process: to predict and manage charging durations, manage power draw based on economic conditions like electricity cost, and communicate charging updates with the driver and/or other users even when they were away from the vehicle. The Asserted Patents embody the technical architecture of this intelligent

---

[14] *See* Dep't of Energy, *Timeline: History of the Electric Car* (visited Mar. 1, 2026), https://www.energy.gov/timeline-history-electric-car.

charging ecosystem and claim priority to a provisional application filed in August 2008.

34.     The solutions embodied by the Asserted Patents at the time of their invention were novel and inventive both within and outside the EV industry. Technologies underpinning real-time wireless charging alerts and notifications that EV users take for granted today were virtually nonexistent in 2008. Smartphones like Apple's first iPhone had only just begun to enter the market, the Apple App Store was launched in July 2008,[15] and the concept of Internet of Things ("IoT") connectivity—including real-time communication between devices like vehicles and remote user interfaces—was nascent and largely theoretical.[16] The term "IoT" had only recently entered industry discourse; connected devices capable of sending wireless alerts and notifications to users were the exception, not the rule. As one source explains, 2010–2016 "marked a groundbreaking point when the technological maturity and the proliferation of IoT use cases, commercial interest, and practical benefits of technology implementation across industries began to converge."[17]

35.     Connected vehicle technology was similarly in its infancy.[18] Although limited, early telematics systems existed in some luxury vehicles, intelligent vehicle-to-device communication and charging management set forth in the claims of the Asserted Patents represented a technological leap.

---

[15] Apple, *The App Store turns 10* (July 5, 2018), https://www.apple.com/newsroom/2018/07/app-store-turns-10/.

[16] Dave Evans, *The Internet of Things: How the Next Evolution of the Internet Is Changing Everything* (Apr. 2011), *available at* http://www.cisco.com/c/dam/en_us/about/ac79/docs/innov/IoT_IBSG_0411FINAL.pdf.

[17] *See* I. Katlinsky, *History of the Internet of Things: Key Milestones & Future Prospects*, ITransition (Aug. 5, 2025), https://www.itransition.com/iot/history#history.

[18] *See* M.A. Rahim et al., *Evolution of IoT-Enabled Connectivity & Applications in Automotive Industry: A Review*, 27 Vehicular Commc'ns 100285 (Jan. 2021), *available at* https://doi.org/10.1016/j.vehcom.2020.100285; CompassIoT, *A Brief Background on Connected Vehicles*, https://www.compassiot.com.au/us/ultimate-guide-to-connected-vehicles/background-on-connected-vehicles (visited Mar. 1, 2026).

36.    The inventor also recognized that for EV adoption to be widespread, other challenges would need to be overcome. For example, reducing the friction of charging (which requires individuals to plug in their EV to charge at home or work and unplug before driving away) by providing a wireless option such as inductive charging. And because induction requires coil alignment (to ensure efficient magnetic-field coupling), an important advance of wireless inductive charging for EVs is providing EV drivers and/or other users information on a display to confirm when the EV and its inductive elements are aligned over the charging pad.

37.    The Asserted Patents recite novel and inventive systems and methods that address EV charging problems such as the ones described above. They comprise claims addressing systems and methods like vehicle display charging controllers and interfaces, onboard charging controllers, scheduled charging and off-peak charging features, dynamic time-remaining calculations and pre-charge updates, user-set threshold charge limits, wireless charge-status notifications, and inductive charging controls and notifications, as described further below.

## TESLA'S ELECTRIC VEHICLES

38.    Tesla's business "includes the design, development, manufacturing, sales and leasing of high-performance fully electric vehicles . . . ."  Within the United States, Tesla currently manufactures, offers for sale, and sells several categories of vehicles at issue here. For example, Tesla sells the Model 3, Y, S, X, Cybertruck, and Semi (the "Accused Tesla Vehicles"). Tesla also operates its Robotaxi business, which currently uses Model Y vehicles and will soon use Tesla's purpose-built Cybercab as well. Tesla describes the foregoing as follows:

> Model 3 is a four-door mid-size sedan that we designed for manufacturability with a base price for mass-market appeal.
>
> Model Y is a compact sport utility vehicle ("SUV") built on the Model 3 platform with seating for up to seven adults.
>
> Model S is a four-door full-size sedan and Model X is a mid-size

SUV with seating for up to seven adults. Model S and Model X feature the highest performance characteristics and longest ranges that we offer in a sedan and SUV, respectively.

The Cybertruck is a full-size electric pickup truck with a stainless steel exterior that has the utility and strength of a truck while featuring the speed of a sports car.

In 2022, we also began early production and deliveries of a commercial electric vehicle, the Tesla Semi. . . .

In June 2025, we launched our Robotaxi service, an autonomous ride-hailing platform that harnesses our technology and vehicles. . . . Our Robotaxi business currently operates with Model Y vehicles but, in time, will include Cybercab, our purpose-built autonomous vehicle.[19]

39. The "Accused Products" include the Accused Tesla Vehicles and Cybercabs, and devices and/or equipment that connect with the Accused Tesla Vehicles and Cybercabs and are configured to operate in the manner set forth below.

40. Tesla "generally sell[s] [its] products directly to customers, and continue[s] to grow [its] global retail, service and charging footprint . . . ." With respect to the Cybercab, Tesla both operates a Robotaxi business and anticipates selling, leasing, or delegating Cybercabs to third parties to manage as a fleet.[20]

41. Tesla sells the Accused Tesla Vehicles, each of which incorporates chargers and other technology to control charging, use, user-notifications, and optimization of the battery. As Tesla explains:

***Vehicle Control and Infotainment Software***

The performance and safety systems of our vehicles and their battery packs utilize sophisticated control software. Control systems in our

---

[19] 2025 Annual Report at 2.
[20] Tesla, *We, Robot | Tesla Cybercab Unveil* at 10:51, https://www.youtube.com/watch?v=6v6dbxPlsXs (Oct. 10, 2024) (E. Musk: "And I think there'll be an interesting business model where let's say somebody is an Uber or Lyft driver today, where they can actually sort of manage a fleet of [Cyber]cars . . . .").

vehicles optimize performance, customize vehicle behavior, manage charging and control all infotainment functions. We develop almost all of this software, including most of the user interfaces, internally and update our vehicles' software regularly through over-the-air updates . . . .

### Battery and Powertrain

Our core vehicle technology competencies include powertrain engineering and manufacturing and our ability to design vehicles that utilize the unique advantages of an electric powertrain. We have designed our proprietary powertrain systems to be adaptable, efficient, reliable and cost-effective while withstanding the rigors of an automotive environment. . . . We maintain extensive testing and R&D capabilities for battery cells, packs and systems, and have built an expansive body of knowledge on lithium-ion cell chemistry types and performance characteristics. . . .[21]

42. On information and belief, the "optimize[d] performance" and "manage[d] charging" controls in Tesla's vehicles include functionality that controls when and how the vehicle charger activates to charge up the onboard battery. For example, Tesla states that its vehicles permit consumers to "Set your charging schedule so that your vehicle is ready when you need to leave. Customize your settings so your Tesla only charges at low-cost times to help you save more." Tesla, *Features: Convenience*, https://www.tesla.com/features/convenience (last visited Mar. 2, 2026).

---

[21] *Id.* at 3.

15



43.     On information and belief, Tesla's Cybercab and other vehicles also include features that enable wireless charging between the vehicle (using a built-in charging pad or an adapter coil) and a ground charging pad, when the vehicle pad and ground pad are aligned. Tesla, *Cybercab Wireless Charging*, YouTube, https://www.youtube.com/watch?v=sDUOky6TYtw (Oct. 21, 2024).



Cybercab Wireless Charging | Tesla

**TESLA'S KNOWLEDGE OF THE ASSERTED PATENTS**

44.     On information and belief, Tesla has known of the existence of ChargeLogic's patents, and its acts of infringement have been willful and in disregard for the Asserted Patents, without any reasonable basis for believing it had a right to engage in the infringing conduct or sales.

45.     For example, Tesla's U.S. Patent No. 12,272,189,[22] which issued on April 8, 2025, includes among its "References Cited" the published patent application for the '567 Patent (U.S. Patent App. Pub. No. 2011/0175569 A1) (published Jul. 21, 2011):

| (56) | | References Cited | |
|---|---|---|---|
| | | U.S. PATENT DOCUMENTS | |
| 2005/0057098 A1* | 3/2005 | Bouchon | B60K 6/46 180/65.245 |
| 2009/0254240 A1 | 10/2009 | Olsen et al. | |
| 2010/0049403 A1 | 2/2010 | Gillman et al. | |
| 2011/0071679 A1 | 3/2011 | Barajas et al. | |
| 2011/0175569 A1* | 7/2011 | Austin | B60L 53/126 320/109 |

46.     During the prosecution of Tesla's '189 Patent, on August 15, 2024, the patent

---

[22] The '189 Patent identifies Tesla, Inc. as the Applicant, and indicates that inventors Atchyuth Gorti, David Glasco, and Daniel William Bailey, hail from Austin, Texas.

examiner sent a non-final office action containing a substantive rejection in which then-proposed "[c]laims 9 and 19 were rejected under 35 U.S.C. § 103 as being unpatentable over [one reference] in view of U.S. Patent Publication 2011/0175569 to Austin [the '567 Patent]." As of the date of the examiner's August 15, 2024 office action, the '567 Patent had already issued. At least because of this office action, Tesla had pre-suit knowledge of the '567 Patent.

47.     Further, as each of the Asserted Patents are in the same patent family—and each cites back to the '567 Patent which was cited by the patent examiner during Tesla's own patent prosecution—Tesla had pre-suit knowledge of each of the Asserted Patents.

### COUNT 1—INFRINGEMENT OF THE '567 PATENT

48.     ChargeLogic repeats and realleges all preceding paragraphs, as if fully set forth herein.

49.     On October 2, 2018, the United States Patent and Trademark Office duly and legally issued the '567 Patent entitled Vehicular Battery Charger, Charging System, and Method. A true and correct copy of the '567 Patent is attached as **Exhibit 1** to this Complaint.

50.     ChargeLogic owns all rights, title, and interest in and to the '567 Patent, including the right to assert all causes of action under the '567 Patent and the right to any remedies for the infringement of the '567 Patent.

51.     Tesla has directly infringed, and continues to directly infringe, the '567 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, without authorization, one or more products that practice various claims of the '567 Patent, literally or under the doctrine of equivalents (the Accused Products). At a minimum, such Accused Products include all devices that infringe the claims of the '567 Patent. This includes products like the Accused Tesla Vehicles, as well as any

other similar products.

52.    As detailed below, the Accused Products are configured by Tesla to practice every claim of at least claim 8 of the '567 Patent literally or under the doctrine of equivalents.[23] Further, the identified components and functionality are representative of the components and functionality present in all Accused Products.

53.    The '567 Patent generally relates to technology that controls charging of EV batteries. The claims of the '567 Patent, including claim 8, recite novel and inventive systems and methods to control battery charging based upon a time of day, cost of power, and other factors.

54.    For example, claim 8 of the '567 Patent recites:

8. A vehicle charger for charging a battery of a vehicle in the course of a charging session, the vehicle charger adapted for wireless communication with a computer remote from the vehicle and vehicle charger, the computer including a remote controller, the vehicle charger comprising:

a controller;

a display coupled to the controller and adapted to display a time; and

a user-manipulatable control coupled to the controller and operable by a user to enter a time of day at which the charging session will end,

wherein the controller automatically changes the supply of electric power to the vehicle battery during the course of the charging session by at least one of a group consisting of increasing a rate of charge of the battery, decreasing the rate of charge of the battery, starting battery charging, and stopping battery charging based at least in part upon the time needed to charge the vehicle battery by the time of day entered by the user,

wherein the controller automatically changes the supply of electric power to the vehicle battery at a time associated with

---

[23] This description is illustrative and is not intended to be an exhaustive or limiting explanation of every manner in which each '567 Accused Product infringes the '567 Patent.

a cost of power to the battery reaching a threshold cost of power to the battery, wherein changing the charging state of the vehicle charger includes automatically starting charging when the cost of power to the battery is equal to or less than the threshold cost of power, and

wherein the controller is responsive to at least one signal from the remote controller by changing the supply of electric power to the vehicle battery to start charging, the at least one signal from the remote controller being received by the controller in response to a user selecting a second user-manipulable control on a screen associated with the remote controller.

55.    The claims of the '567 Patent, including claim 8, are directed to patent-eligible subject matter. The claims are not directed to an abstract idea under the first step of the *Alice/Mayo* framework. The claims also recite an inventive concept that confirm the claims are drawn to a patent-eligible application under the second step of the framework.

56.    At the time of the invention disclosed in the '567 Patent, the claimed combination of elements was unconventional and not well-understood or routine in the field. For example, as explained above, in 2008, EV charging was generally an unintelligent process: a vehicle was plugged in, and the charger drew power until the battery was full or the vehicle was unplugged. Real-time wireless charging alerts and IoT connectivity between vehicles and remote user interfaces were virtually nonexistent at the time of the invention. The concept of a controller that automatically modulated the supply of electric power based on a user-entered departure time, a time-associated cost-of-power threshold, and signals received from a remote controller on a portable device was not conventional, well-understood, or routine—either individually or in combination. *See* Ex. 1 at, *e.g.*, col. 1:17–55.

57.    The '567 Patent claims also recite a specific combination of technical elements—including a controller, a display coupled to the controller and adapted to display a time, a user-manipulatable control for entering a departure time, automatic modulation of power supply based

20

on departure time and the time-associated threshold cost of power, and responsiveness to remote start-charge signals—that together constitute an inventive concept. These elements, including automatically starting charging at a given condition, provide order for dynamically managing power delivery based on temporal, economic, and user-directed inputs.

58.     The specification of the '567 Patent confirms that the claimed inventions represented a departure from and an improvement over the prior art. *See, e.g.*, Ex. 1 at 1:17–55. For example, the specification explains that the increased draw of electric power for EVs would strain community power systems, and the claimed invention—by combining elements like those described above—would help to resolve those issues. *See, e.g.*, 28:48–29:23, 43:48–60. Further, the prior art did not teach or suggest an onboard vehicular charger controller that combined scheduled end-time charging, power modulation, and remote wireless start-charge capability in a single integrated system. The claims of the '567 Patent recite a specific technological solution implemented through specific hardware and software components that were not available or conventional in 2008.

59.     Each of the Accused Products practices every element of at least claim 8.

60.     Each of the Accused Products includes and comprises a vehicle charger for charging a battery of a vehicle in the course of a charging session, the vehicle charger adapted for wireless communication with a computer remote from the vehicle and the vehicle charger, the computer including a remote controller. For example, Accused Tesla Vehicles incorporate an onboard charger (OBC) and telematics enabling wireless connectivity (cellular/WiFi) to remote computers and user devices, wherein the OBC handles storage of direct current (DC) energy in part by converting alternating current (AC) power into DC energy so that it can be stored in the vehicle's         battery.         *See,*         *e.g.,*         Tesla,         *Onboard*         *Charger*,

21

https://www.tesla.com/support/charging/onboard-charger (last visited Mar. 1, 2026) (describing "onboard charger" capabilities):



When a Wall Connector or Mobile Connector plugs into the charge port it provides alternating current, also known as AC power, to your vehicle. Batteries store energy as direct current, also known as DC energy.

The onboard charger, which is built in your vehicle, handles this by converting the AC power into DC energy so that it can be stored in the battery.

61.     Further, for example, the Owner's Manual states: "The Tesla mobile app allows you to communicate with Model 3 remotely using your iPhone® or Android™ phone." Further, for example, Accused Tesla Vehicles have built-in cellular modems (with SIMs) and Wi-Fi that maintain internet connectivity for remote monitoring and control. *See, e.g.*, Tesla Owner's Manual at 54, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026) (describing mobile app connectivity including for control and status of the OBC):

62.     Further, for example, Tesla's Mobile App ("Mobile App"), enabled and accessible through a user's computer/mobile devices, is a "remote controller" to control charging sessions; the user can "communicate with [the car] remotely" and perform functions like checking charging status. *Id.* at 54, 176–81.

63.     Accused Tesla Vehicles also connect to Tesla's servers for features like live

23

telemetry and updates. For example, Tesla's support documentation explains that all vehicles have Standard Connectivity for 8 years, enabling remote services via Tesla's network. This connectivity allows the vehicle's charging system to be wirelessly accessed and controlled. *See, e.g.*, Tesla, *Connectivity*, https://www.tesla.com/support/connectivity (last visited Mar. 1, 2026).

# Connectivity

Connectivity is an important part of all Tesla vehicles, further enhancing the driving experience by providing access to features that require data usage — including streaming music and media, live traffic visualization and more.

All Tesla vehicles come with access to Standard Connectivity. Standard Connectivity is included in your vehicle, at no additional cost, for eight years beginning on the first day your vehicle was delivered as new by Tesla or the first day it is put into service (for example, used as a demonstrator or service vehicle), whichever comes first. If you are purchasing a pre-owned vehicle, you will be notified of how long your vehicle will include access to Standard Connectivity. With Standard Connectivity, you have access to most connectivity features over Wi-Fi, in addition to basic maps and navigation and music streaming over Bluetooth®.

64.     The Accused Products also comprise and include a controller that controls vehicular battery charging and manages charging of the battery, such as via an onboard Battery Management System (BMS) and charging control electronics and processors that monitor, manage, and transmit and receive data about vehicular charging (the "Controller"). This onboard BMS and associated charge control modules and processors control charge rate, monitor battery state, and execute charging schedules. *See, e.g.*, EVinventory, *Tesla Battery Management System (BMS) Calibration*, https://ev-inventory.com/guide/tesla-bms-calibration.php (last updated Apr. 10, 2024); Tesla Owner's Manual at 185, 232–33 https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026).

65.     Further, as discussed above, for example, Accused Tesla Vehicles also contain on-board charger hardware and hardware control circuitry to regulate charging. In the Accused Tesla Vehicles, firmware and/or software manages AC/DC charging, and the OBC is controlled by the

vehicle's firmware to manage AC/DC charging.

66. Further, the Accused Products comprise and include a display coupled to the controller and adapted to display a time. For example, Accused Tesla Vehicles include an interactive display that shows time information, including the current time of day, scheduled charge times, and "start at" and "end by times" for the in-car charging schedule and coupled to the controller. *See, e.g.*, *id.* at 6 (depicting touchscreen with continuous current time), 181 (describing using the touchscreen or Mobile App to access and use scheduled charging features); *see also* M. Merano, *Tesla Highlights Advantages of its Scheduled Departure Feature*, TeslaRati, https://www.teslarati.com/tesla-highlights-scheduled-departure-advantages-video/ (Feb. 13, 2023).

**Using Scheduled Charging**

When you create or enable a scheduled charge, you can plug in your vehicle for a charge. If you scheduled a precondition or charge for later in the day, Model 3 waits until that time to precondition or charge.

When your schedules overlap, the vehicle uses the largest block of time for charging, if necessary. Example: You scheduled Model 3 to start charging at 2 AM and at 3 AM, but to stop charging at 2:30 AM and 5 AM, the vehicle combines the two charge schedules into a single block from 2 AM to 5 AM.

When you specify an **End by** time, but not a **Start at** time, the vehicle briefly draws power when plugging in for scheduled charging (you may hear clicking) to calculate the necessary start time to meet your charge limit. Example: You configure an **End by** time of 2 AM and the vehicle needs 2 hours to charge to meet the charge limit. If you plug in your vehicle at 9 PM, Model 3 briefly draws power to calculate the start time and begins charging at 12 AM.

If you specify a **Start at** time and no **End by** time, the vehicle begins charging at the specified time and continues until your charge limit is reached.

There are scenarios where **Scheduled Charging** starts immediately. These scenarios can occur when Model 3 is plugged in:

- During a scheduled charge.
- Up to 6 hours after the start of a scheduled charge, if there is no specified **End by** time.
- When the next scheduled charge is more than 18 hours away and not the current day.
- When you haven't configured a **Start at** time and there is not enough time to reach the charge limit by the **End by** time.

**NOTE:** Model 3 does NOT automatically start charging if you plug in your vehicle within 6 hours after the **End by** time of a scheduled charge, unless there is another scheduled charge.

You can schedule your charge to finish right at a planned departure time to reduce energy costs, even in market regions where off-peak utility rates are not applicable. Example: if charging starts as soon as you plug in, charging may complete much sooner. This causes the Battery to cool down to ambient temperatures and requires energy to warm it back up by your departure time. Therefore, even if off-peak utility rates are not applicable to you, Tesla recommends that you charge until your planned departure time in order to reduce energy consumption by specifying your departure time as the scheduled **End by** time.

67. The Accused Products also comprise and include a user-manipulatable control coupled to the controller and operable by a user to enter a time of day at which the charging session will end. For example, Accused Tesla Vehicles include a Scheduled Charge "End Time" / Departure feature in which the user inputs a desired departure time, which is a time of day at which

the charging session will end. For example, users can toggle "End Charging by [time]" on the car's touchscreen. Further, for example, the user-manipulatable control by which users can control "End by" time settings is coupled to the vehicle's Controller, which stores and uses the input time to manage charging. *See, e.g.,* Tesla Owner's Manual at 181 https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026); *see also* M. Merano, *Tesla Highlights Advantages of its Scheduled Departure Feature*, TeslaRati, https://www.teslarati.com/tesla-highlights-scheduled-departure-advantages-video/ (Feb. 13, 2023):

> "When **Scheduled Departure** is displayed, touch **Schedule** to set a daily time when you want Model 3 to be ready to drive. Specify a time, then touch **Settings** to enable one or both of the following departure features. When plugging in with **Off-Peak Charging** enabled, the vehicle briefly draws power (you may hear clicking) to calculate the necessary charging start time.
> "After you've specified your desired settings, touch **Set**. The touchscreen displays your scheduled departure time.

68.    The Accused Products also include a controller wherein the controller automatically changes the supply of electric power to the vehicle battery during the course of the charging session by at least one of a group consisting of increasing a rate of charge of the battery, decreasing the rate of charge of the battery, starting battery charging, and stopping battery charging based at least in part upon the time needed to charge the vehicle battery by the time of day entered by the user. For example, Accused Tesla Vehicles comprise and include a Controller that implements "charge by" scheduling logic; the Scheduled Departure feature automatically controls charging so that the vehicle is charged by the set departure time. Further, for example, the Controller automatically changes the charging state (when to start/stop charging, increase or decrease the rate of charge) based at least in part on the time needed to charge the vehicle battery

24

by the time of day entered by the user. *See, e.g.*, *id.*; Tesla, *Schedule Your Departure*, YouTube, https://www.youtube.com/watch?v=IfCgYIAtugU (Feb. 13, 2023); Tesla, *Tesla Model 3 Quick Video | Charge Status Screen*, YouTube, https://www.youtube.com/watch?v=7A6Dh2LHBbo (Jan. 19, 2020); Tesla Owners Documentation at 216, *available at* https://static.nhtsa.gov/odi/tsbs/2023/MC-10247399-9999.pdf (last visited Mar. 1, 2026):

69. Further, the Accused Products include a controller wherein the controller automatically changes the supply of electric power to the vehicle battery at a time associated with a cost of power to the battery reaching a threshold cost of power to the battery, wherein changing the charging state of the vehicle charger includes automatically starting charging when the cost of power to the battery is equal to or less than a threshold cost of power. For example, Accused Tesla Vehicles provide both time-of-use and off-peak charging features, which provide for charging of Accused Tesla Vehicles when electricity is cheaper—that is, scheduling for charging during off-peak periods defined by the user. Off-peak charging results in the Controller automatically

changing the supply of electric power to the vehicle battery at a time associated with a cost of power to the battery reaching a threshold cost of power to the battery, with the Controller automatically starting charging when the cost of power to the battery is equal to or less than a threshold cost of power. Each Accused Tesla Vehicle's Controller automatically starts charging at a time that corresponds to a lower tariff, or user-defined threshold of cost; Tesla emphasizes charging overnight when power is cheaper. *See, e.g.*, Tesla Owner's Manual at 181 https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026); *see also* M. Merano, *Tesla Highlights Advantages of its Scheduled Departure Feature*, TeslaRati, https://www.teslarati.com/tesla-highlights-scheduled-departure-advantages-video/ (Feb. 13, 2023); Tesla, *Schedule Your Departure*, YouTube, https://www.youtube.com/watch?v=IfCgYIAtugU (Feb. 13, 2023); Tesla, *Tesla Model 3 Quick Video | Charge Status Screen*, YouTube, https://www.youtube.com/watch?v=7A6Dh2LHBbo (Jan. 19, 2020); Tesla, *Home Charging*, https://www.tesla.com/home-charging (last visited Mar. 1, 2026); Tesla Owners Documentation at 216, *available at* https://static.nhtsa.gov/odi/tsbs/2023/MC-10247399-9999.pdf (last visited Mar. 1, 2026).



70.    Further, the Accused Products include a controller wherein the controller is responsive to at least one signal from the remote controller by changing the supply of electric power to the vehicle battery to start charging. For example, each Accused Tesla Vehicle's Controller is responsive to one or more signals from the Mobile App by changing the supply of electric power to the vehicle battery to start charging, such as by entering scheduled charge times, allowing users to select "Start Charging" and "Stop Charging" buttons, and other functionality.

*See, e.g.*, Reddit, Post & Comments, *Charge to 100% that ends at a specific time*, https://www.reddit.com/r/TeslaLounge/comments/1jnhlzk/charge_to_100_that_ends_at_a_specif ic_time/; Tesla, Model S Software Release Notes v4.3 (2012), *available at* https://www.tesla.com/sites/default/files/blog_attachments/software_update_4.3.pdf.

71. Further, the Accused Products include a controller wherein the controller is responsive to at least one signal from the remote controller by changing the supply of electric power to the vehicle battery to start charging, the at least one signal from the remote controller being received by the controller in response to a user selecting a second user-manipulable control on a screen associated with the remote controller. For example, as explained above, the Mobile App provides on-screen controls for charging separate from the in-vehicle display. For example, the user can open the Mobile App and set up Scheduled Departure and off-peak charging, as well as use and deploy the "Start Charging" and "Stop Charging" buttons, each of which comprises a user selecting a second user-manipulable control. Each selection provides a signal from the remote controller (Mobile App) being received by the Controller in response to a user selecting a second user-manipulable control on a screen associated with the remote controller. For example, when a user taps the "Start Charging" button, the Controller receives a signal from the Mobile App to change the charging state. *See, e.g.*, Tesla Owner's Manual at 181 https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026); *see also* M. Merano, *Tesla Highlights Advantages of its Scheduled Departure Feature, TeslaRati*, https://www.teslarati.com/tesla-highlights-scheduled-departure-advantages-video/ (Feb. 13, 2023); Tesla, *Schedule Your Departure*, YouTube, https://www.youtube.com/watch?v=IfCgYIAtugU (Feb. 13, 2023); Tesla, *Tesla Model 3 Quick Video | Charge Status Screen*, YouTube, https://www.youtube.com/watch?v=7A6Dh2LHBbo

27

(Jan. 19, 2020); Tesla, *Home Charging*, https://www.tesla.com/home-charging (last visited Mar. 1, 2026); Tesla Owners Documentation at 216, *available at* https://static.nhtsa.gov/odi/tsbs/2023/MC-10247399-9999.pdf (last visited Mar. 1, 2026); Tesla, *Tesla App*, YouTube, https://www.youtube.com/watch?v=ddBYLW_ffpg (July 16, 2025).



72.    Tesla thus directly infringed, and continues to directly infringe, each element of at least claim 8 of the '567 Patent by, *e.g.*, without authorization, operating, using (including internal use and testing), offering for sale, and selling, and continuing to operate, use (including internal use and testing), offer for sale, and sell, the Accused Products, which infringe at least claim 8 of the '567 Patent.

73. As described above, Tesla had pre-suit knowledge of the '567 Patent at least as of August 15, 2024, and constructive knowledge as of the date it was issued.

74. Since having notice of the '567 Patent, Tesla has indirectly infringed and continues to indirectly infringe the '567 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including agent-subsidiaries, affiliates, partners, service providers, resellers, customers, and/or end users, in this District and elsewhere in the United States, through the dissemination and maintenance of the Accused Products, the dissemination and maintenance of compatible charging stations, and the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, technical information, and/or app releases and updates relating to the Accused Products with knowledge and the specific intent that its efforts will result in the direct infringement of the '567 Patent.

75. For example, Tesla took active steps to encourage end users to use charging control mechanisms in the Accused Products in the United States in a manner Tesla knows will directly infringe each element of at least claim 8 of the '567 Patent, including by selling the Accused Products and encouraging users to use the charging control mechanisms in the Accused Products, despite knowing of the '567 Patent and the fact that usage of the charging control mechanisms will infringe the '567 Patent.

76. Such active steps include, for example, advertising and marketing Accused Tesla Vehicles, marketing and selling of devices capable of or intended for use in controlling charging, publishing manuals and promotional literature describing and instructing users to use those charging control mechanisms, and offering support and technical assistance to its customers that encourage use of the charging control mechanisms in ways that will directly infringe at least claim

8 of the '567 Patent.

77.     Tesla undertook and continues to undertake the above-identified active steps after receiving notice of the '567 Patent and how those steps induce infringement of the '567 Patent.

78.     Tesla's acts of infringement have caused and continue to cause damage to ChargeLogic, and ChargeLogic is entitled to recover from Tesla the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '567 Patent, together with interest and costs as fixed by the Court.

79.     Tesla has had actual notice of ChargeLogic's '567 Patent at least as early as August 15, 2024. Tesla received constructive notice of the '567 Patent at least as early as when the U.S. Patent and Trademark Office issued the '567 Patent. Tesla performed and continues to perform the acts that constitute direct and/or indirect infringement, with knowledge or willful blindness that the acts would constitute direct and/or indirect infringement of the '567 Patent.

## COUNT 2—INFRINGEMENT OF THE '107 PATENT

80.     ChargeLogic repeats and realleges all preceding paragraphs, as if fully set forth herein.

81.     On February 22, 2022, the United States Patent and Trademark Office duly and legally issued the '107 Patent entitled Vehicular Battery Charger, Charging System, and Method for Transmitting Battery Charge Threshold Information. A true and correct copy of the '107 Patent is attached as **Exhibit 2** to this Complaint.

82.     ChargeLogic owns all rights, title, and interest in and to the '107 Patent, including the right to assert all causes of action under the '107 Patent and the right to any remedies for the infringement of the '107 Patent.

83.     Tesla has directly infringed, and continues to directly infringe, the '107 Patent in violation of 35 U.S.C. § 271(a) by, *e.g.*, making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, without authorization, one or more products that practice various claims of the '107 Patent, literally or under the doctrine of equivalents (the Accused Products). At a minimum, such Accused Products include all devices that infringe the claims of the '107 Patent, including the Accused Tesla Vehicles and any other similar products.

84.     As detailed below, the Accused Products are configured by Tesla to practice every claim of at least claim 6 of the '107 Patent literally or under the doctrine of equivalents.[24] Further, the identified components and functionality are representative of the components and functionality present in all Accused Products.

85.     The '107 Patent generally relates to methods and systems that control charging of EV batteries. The claims of the '107 Patent, including claim 6, recite novel and inventive systems and methods for managing and providing charging alerts.

86.     For example, claim 6 of the '107 Patent recites:

> 6. A method of charging a battery of a vehicle, the method comprising:
>
> > establishing wireless communication between a controller of the vehicular battery charger and a portable controller of a user remote from the vehicle and the vehicular battery charger;
> >
> > receiving, via a user-manipulatable control, data indicative of a predetermined threshold level of charge by which the controller sends an alert, the predetermined threshold level of charge being less than a full charge of the battery;
> >
> > supplying power to the battery of the vehicle via the vehicular battery charger;
> >
> > comparing, during charging of the battery with the vehicular

---

[24] This description is illustrative and is not intended to be an exhaustive or limiting explanation of every manner in which each Accused Product infringes the '107 Patent.

31

battery charger, a level of charge of the battery to the predetermined threshold level of charge; and

generating and wirelessly transmitting, during the charging of the battery and before the charging of the battery is complete, a signal to the portable controller responsive to detecting the level of charge of the battery reaching the predetermined level of charge of the battery.

87. The claims of the '107 Patent, including claim 6, are directed to patent-eligible subject matter. The claims are not directed to an abstract idea under the first step of the *Alice*/*Mayo* framework. The claims also recite an inventive concept that confirm the claims are drawn to a patent-eligible application under the second step of the framework.

88. The '107 Patent provides a specific technical improvement to the operation of vehicular battery charging systems. Rather than requiring the user to remain near the vehicle or periodically check the charging status, the claimed method enables autonomous monitoring of the charge state against a user-defined threshold and proactively notify the user on a remote portable device. *See, e.g.*, Ex. 2 at 21:62–22:59, 39:57–40:3. This improvement was not a generic application of wireless communication but rather a specific, technologically-grounded solution to the problem of real-time remote charge-status awareness during EV battery charging—a problem that was itself novel at the time of invention.

89. At the time of the invention disclosed in the '107 Patent, the claimed combination of elements was unconventional and not well-understood or routine in the field. For example, as explained above, in 2008, real-time wireless charging alerts and IoT connectivity between vehicles and remote user interfaces were virtually nonexistent at the time of the invention. *See, e.g.*, *id.* No prior art system combined, in a single integrated method, the elements recited above: establishing the specified wireless communication, receiving the predetermined threshold level, comparing the battery's charge to that threshold, and generating and wirelessly transmitting a notification

32

responsive to the battery reaching the predetermined level. This ordered combination was not routine or conventional in the EV charging field or in any adjacent field of technology.

90.    The claimed inventions represented a departure from and an improvement over the prior art. For example, the prior art did not teach or suggest wireless notifications from the vehicle controller to a remote device, triggered by reaching a user-set threshold charge level. The claims of the patent do not merely recite the abstract idea of sending a notification; for example, claim 6 recites a specific method by which an onboard charger controller monitors charge state, compares it to a user-defined threshold, and generates and transmits a wireless signal to a portable controller—each step requiring specific technical implementation that was not conventional at the time.

91.    Tesla directly infringes and continues to directly infringe, literally and/or under the doctrine of equivalents, the method of at least claim 6 when it performs the methods by testing and using its own infringing vehicles.

92.    Each of the Accused Products comprises a vehicle, a vehicular battery charger, and controller of said battery charger, that: establishes wireless communication between a controller of the vehicular battery charger and a portable controller of a user remote from the vehicle and the vehicular battery charger; receives, via a user-manipulatable control, data indicative of a predetermined threshold level of charge by which the controller sends an alert, the predetermined threshold level of charge being less than a full charge of the battery; supplies power to the battery of the vehicle via the vehicular battery charger; compares, during the charging of the battery with the vehicular battery charger, a level of charge of the battery to the predetermined threshold level of charge; and generates and wirelessly transmits, during the charging of the battery and before the charging of the battery is complete, a signal to the portable controller responsive to detecting

33

the level of charge of the battery reaching the predetermined level of charge of the battery.

93.     For example, Accused Tesla Vehicles comprise an onboard charger (OBC) and a high-voltage battery pack, wherein the OBC handles storage of DC energy in part by converting AC power into DC energy so that it can be stored in the vehicle's battery. *See, e.g.*, Tesla, Model 3 Owner's Manual: Electric Vehicle Components, https://www.tesla.com/ownersmanual/model3/en_us/GUID-8FA15856-1720-440F-838B-ACFBA8D7D608.html (last visited Mar. 1, 2026) (showing location of high-voltage battery); Tesla, *Onboard Charger*, https://www.tesla.com/support/charging/onboard-charger (last visited Mar. 1, 2026) (describing "onboard charger" capabilities).



When a Wall Connector or Mobile Connector plugs into the charge port it provides alternating current, also known as AC power, to your vehicle. Batteries store energy as direct current, also known as DC energy.

The onboard charger, which is built in your vehicle, handles this by converting the AC power into DC energy so that it can be stored in the battery.

94.     Further, for example, Tesla provides external charging devices (Mobile Connector or Wall Connector) that interface with the OBC. For example, the external charging devices and vehicle connector provide AC power from an outlet so that the Tesla OBC may convert the power

34

to DC to be stored in the vehicular battery—*i.e.*, to charge the battery of the vehicle. *See, e.g.*, *id.*; D. Thai, *Tesla Model 3 & Y Home Charging Guide*, ZECar, https://zecar.com/reviews/tesla-model-3-and-y-home-charging-guide (Apr. 3, 2025); RevoluSun, *EV Charging*, https://idaho.revolusun.com/ev-charging/ (last visited Mar. 1, 2026).

95.     Further, the Accused Products establish wireless communication between a controller of the vehicular battery charger and a portable controller of a user remote from the vehicle and the vehicular battery charger. For example, Accused Tesla Vehicles control a vehicular battery charger and manage charging of the battery, including via an onboard Battery Management System (BMS) and other control electronics and processors that monitor, manage, and transmit and receive data about vehicular charging (a Controller). The BMS and other charge-control modules and processors control charge rate, monitor battery state, and execute charge schedules. Further, for example, Accused Tesla Vehicles contain hardware control circuitry to regulate charging. *See, e.g.*, EVinventory, *Tesla Battery Management System (BMS) Calibration*, https://ev-inventory.com/guide/tesla-bms-calibration.php (last updated Apr. 10, 2024); Tesla Owner's Manual at 185, 232–33 https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026); EVexpert, *On-Board Charger*, https://www.evexpert.eu/eshop1/knowledge-center/on-board-charger?srsltid=AfmBOop7DZ9K0iy9IZObRJZAL2RM94MSUE4uhn_2fid3u50vNnyRCwvn (last visited Mar. 1, 2026).

96.     Further, for example, the Accused Products incorporate the OBC and telematics and establish wireless communication (such as cellular and/or Wi-Fi connectivity) between the Controller of a vehicular battery charger and a portable controller of a user remote from the vehicle

and the vehicular battery charger, such as remote computers and mobile devices. Accused Tesla Vehicles have built-in cellular modems with SIMs and Wi-Fi that maintain internet connectivity for remote monitoring and control. The Mobile App, enabled and accessible through a user's computer/mobile devices, operates as a Portable Controller through which a user can communicate with the car remotely and perform functions like checking charging status. *See, e.g.*, Tesla Owner's Manual at 54, 176–81, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026) (describing mobile app connectivity):

## Mobile App

The Tesla mobile app allows you to communicate with Model 3 remotely using your iPhone® or Android™ phone.

**NOTE:** The information below may not represent an exhaustive list of the functions available on the Tesla mobile app. To ensure access to new and improved features, download updated versions of the mobile app as they become available.

### To Use the Mobile App

To set up the Tesla mobile app to communicate with your Model 3:

1. Download the Tesla mobile app to your phone.
2. Log in to the Tesla mobile app by entering your Tesla account credentials.
3. Enable mobile access to your Model 3 by touching **Controls > Safety > Allow Mobile Access**.
4. Turn your phone's Bluetooth setting **ON** and ensure that Bluetooth is turned on within your phone's global settings for the Tesla mobile app. For example, on your phone, navigate to Settings, choose the Tesla mobile app, and ensure the Bluetooth setting is enabled.

Your phone and vehicle must both be actively connected to cellular service or Wi-Fi for the mobile app to communicate with your vehicle remotely. Tesla recommends that you always have a functional physical key readily available if parking in an area with limited or absent cellular service, such as an indoor parking garage.

36

**Overview**

When both your phone and the vehicle have internet service, the Tesla mobile app's home screen allows you to:

- Lock or unlock your vehicle.
- Enable or disable the heating or air conditioning and monitor the cabin climate.
- Check your vehicle's charging information. Charging details also appear when a charging cable is plugged in.
- Open or close the charge port.

  **NOTE:** Twisting red lines next to the Battery icon indicate that the Battery is actively heating up (including while charging or preparing to charge).

- See where your vehicle is located.
- View your vehicle's estimated range.
- Open the front trunk.
- View your vehicle's odometer, VIN, and current software version.

97. Accused Tesla Vehicles also connect to Tesla's servers for live telemetry and updates. Tesla's support documentation explains that all vehicles have Standard Connectivity for 8 years, enabling remote services via Tesla's network. This connectivity allows the vehicle's charging system to be wirelessly accessed and controlled, including while remote from the vehicle and the on-board vehicular battery charger. Such connectivity provides wireless, remote access to and control of the vehicle's charging system and establishes wireless communication between a controller of the vehicular battery charger and a Portable Controller. *See, e.g.*, Tesla, *Connectivity*, https://www.tesla.com/support/connectivity (last visited Mar. 1, 2026).

98. Further, the Accused Products receive, via a user-manipulatable control, data indicative of a predetermined threshold level of charge by which the controller sends an alert, the predetermined threshold level of charge being less than a full charge of the battery. For example, Accused Tesla Vehicles allow users to set a predetermined threshold of charge, such as a charge limit, via the vehicle's in-car touchscreen display or Mobile App. On the in-car display and Mobile App, a charge slider is provided to set the desired charge limit percentage. Tesla provides "recommended daily and trip charging limits," which are predetermined threshold limits of charge, that are less than a full charge of the battery (*e.g.*, 80%). The "charge slider" available on the in-

37

car touchscreen or in the Mobile App is a "user manipulatable" control. Accused Tesla Vehicles receive, via this user-manipulatable charge slider and selected charge level, data indicative of a predetermined threshold level of charge. The data provided by the user via the "charge slider" is applied to charging sessions to manage charging of the battery and is received by the Controller. *See, e.g.,* Tesla Owner's Manual at 174–81, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026) (describing mobile app connectivity); Tesla, *Vehicle Controls | Tesla App*, https://www.tesla.com/support/videos/watch/vehicle-controls-tesla-app (last visited Mar. 1, 2026); EV Chargers, *Tesla Charging Tips*, https://ev-chargers.com/news/tesla-charging-tips/?srsltid=AfmBOopX1kZfsFIxopuuVM1deuWkijkaSJdpQ-GhhWXgtNfOhHJ5pco1 (Nov. 1, 2023).



99.    Further, the Controller continuously monitors the battery's state-of-charge relative to the charge limit during charging. For example, a user can see in the in-car display or in the Mobile App the current state of charging. In addition, for example, the Accused Tesla Vehicles send wireless notifications to the Portable Controller during the charging of the battery and before

the charging of the battery is complete. For example, when an Accused Tesla Vehicle is charging, the Mobile App will receive a push notification, generated and wirelessly transmitted from the Accused Tesla Vehicle, before charging is complete stating that the vehicle is about to or has reached its set limit. *See, e.g.*, Tesla Owner's Manual at 54, 174–81, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026); Tesla, *Charge*, https://www.tesla.com/charge (last visited Mar. 1, 2026).





100.    Further, the Accused Products supply power to the battery of the vehicle via the vehicular battery charger. For example, as discussed above, Accused Tesla Vehicles supply power

to the battery via an on-board charger. Further, for example, Tesla provides external charging devices (Mobile Connector or Wall Connector) that interface with the OBC. For example, the external charging devices and vehicle connector provide AC power from an outlet so that the Tesla OBC may convert the power to DC to be stored in the vehicular battery—*i.e.*, to charge the battery of the vehicle. *See, e.g.*, Tesla, *Model 3 Owner's Manual: Electric Vehicle Components*, https://www.tesla.com/ownersmanual/model3/en_us/GUID-8FA15856-1720-440F-838B-ACFBA8D7D608.html (last visited Mar. 1, 2026) (showing location of high-voltage battery); Tesla, *Onboard Charger*, https://www.tesla.com/support/charging/onboard-charger (last visited Mar. 1, 2026) (describing "onboard charger" capabilities); D. Thai, *Tesla Model 3 & Y Home Charging Guide*, ZECar, https://zecar.com/reviews/tesla-model-3-and-y-home-charging-guide (Apr. 3, 2025); RevoluSun, *EV Charging*, https://idaho.revolusun.com/ev-charging/ (last visited Mar. 1, 2026).

101.    Further, the Accused Products compare, during charging of the battery with the vehicular battery charger, a level of charge of the battery to the predetermined threshold level of charge. For example, as discussed above, Accused Tesla Vehicles receive, via a user-manipulatable control, data indicative of a predetermined threshold level of charge. For example, Accused Tesla Vehicles allow users to set a predetermined threshold level of charge, such as a charge limit, via the in-car touchscreen display or Mobile App. The Controller compares the battery's current charge level to the threshold charge level during the charging process. For example, Accused Tesla Vehicles actively track progress toward the charge level or charge limit. The controller monitors the battery charge level and compares it to the charge limit, providing a continuous real-time comparison, via the OBC. For example, charging is automatically tapered and stopped when the threshold is met, and the user can monitor the current battery charge,

including as compared to the threshold, such as in the Mobile App. *See, e.g.,* Tesla Owner's Manual at 54, 174–81, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026) (describing mobile app connectivity); Tesla, *Vehicle Controls | Tesla App*, https://www.tesla.com/support/videos/watch/vehicle-controls-tesla-app (last visited Mar. 1, 2026); EV Chargers, *Tesla Charging Tips*, https://ev-chargers.com/news/tesla-charging-tips/?srsltid=AfmBOopX1kZfsFIxopuuVM1deuWkijkaSJdpQ-GhhWXgtNfOhHJ5pco1 (Nov. 1, 2023); Tesla, *Charge*, https://www.tesla.com/charge (last visited Mar. 1, 2026).



102. Further, the Accused Products generate and wirelessly transmit, during the charging of the battery and before the charging of the battery is complete, a signal to the portable controller responsive to detecting the level of charge of the battery reaching the predetermined level of charge of the battery. For example, Accused Tesla Vehicles generate and wirelessly transmit notifications to the Portable Controller during the charging of the battery and before the charging of the battery is complete. Accused Tesla Vehicles are equipped with wireless data transmitters, including cellular and Wi-Fi, and transmit to the Mobile App signals that provide and generate real-time charging alerts. For example, when an Accused Tesla Vehicle is charging, Mobile App will provide a push notification based on signals generated and wirelessly transmitted from the Accused

Tesla Vehicle, before charging is complete, stating that the vehicle is about to or has reached its charge limit. For example, the Mobile App provides notifications for "Charging Started," "Charging Interrupted," and "Charging Complete." *See, e.g.*, Tesla Owner's Manual at 54, 176–81, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026) (describing mobile app connectivity); Tesla, Model Y Owner's Manual: Connectivity | Mobile App, https://www.tesla.com/ownersmanual/modely/en_th/GUID-F6E2CD5E-F226-4167-AC48-BD021D1FFDAB.html (last visited Mar. 1, 2026) ("View and customize notifications you receive under the Settings tab, such as . . . charging updates"); Tesla Motors Club, *Charging Status in Tesla App*, https://teslamotorsclub.com/tmc/threads/charging-status-in-tesla-app.327629/ (May 22, 2024); Not a Tesla App, *Tesla App 4.13 Release Notes*, https://www.notateslaapp.com/tesla-app-updates/version/4.13/release-notes (Sept. 16, 2022).



103.    Tesla has thus directly infringed, and continues to directly infringe, each element of at least claim 6 of the '107 Patent by, *e.g.*, without authorization, operating, using (including internal use and testing), offering for sale, and selling, and continuing to operate, use (including

internal use and testing), offer for sale, and sell, the Accused Products, which infringe at least claim 6 of the '107 Patent.

104.    As described above, Tesla had pre-suit knowledge of the '107 Patent; Tesla had actual knowledge of the '567 Patent since August 15, 2024, and because the '107 Patent cites to and is in the same patent family as the '567 Patent, Tesla had pre-suit knowledge of the '107 Patent. At a minimum, Tesla had knowledge of the '107 Patent no later than the filing of this Complaint.

105.    Since having notice of the '107 Patent, Tesla has indirectly infringed and continues to indirectly infringe the '107 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including agent-subsidiaries, affiliates, partners, service providers, resellers, customers, and/or end users, in this District and elsewhere in the United States, through the dissemination and maintenance of the Accused Products, the dissemination and maintenance of compatible charging stations, and the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, technical information, and/or app releases and updates relating to the Accused Products, and/or providing technical support or services for the Accused Products to customers and end-users with knowledge and the specific intent that its efforts will result in the direct infringement of the '107 Patent.

106.    For example, Tesla took active steps to encourage end users to use charging control mechanisms in the Accused Products in the United States in a manner Tesla knows will directly infringe each element of at least claim 6 of the '107 Patent, including by selling the Accused Products and encouraging users to use the charging control mechanisms in the Accused Products, despite knowing of the '107 Patent and the fact that usage of the charging control mechanisms will

43

infringe the '107 Patent.

107.    Such active steps include, for example, advertising and marketing Tesla's EVs, marketing and selling of devices capable of or intended for use in controlling charging, publishing manuals and promotional literature describing and instructing users to use those charging control mechanisms, and offering support and technical assistance to its customers that encourage use of the charging control mechanisms in ways that will directly infringe at least claim 6 of the '107 Patent.

108.    Tesla undertook and continues to undertake the above-identified active steps after receiving notice of the '107 Patent and how those steps induce infringement of the '107 Patent.

109.    Tesla's acts of infringement have caused and continue to cause damage to ChargeLogic, and ChargeLogic is entitled to recover from Tesla the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '107 Patent, together with interest and costs as fixed by the Court.

110.    Tesla has had actual notice of ChargeLogic's '107 Patent at least as early as August 15, 2024, as a family member of the '567 Patent. Tesla received constructive notice of the '107 Patent at least as early as when the U.S. Patent and Trademark Office issued the '107 Patent. Tesla performed and continues to perform the acts that constitute direct and/or indirect infringement, with knowledge or willful blindness that the acts would constitute direct and/or indirect infringement of the '107 Patent.

## COUNT 3—INFRINGEMENT OF THE '844 PATENT

111.    ChargeLogic repeats and realleges all preceding paragraphs, as if fully set forth herein.

44

112.    On August 8, 2023, the United States Patent and Trademark Office duly and legally issued the '844 Patent entitled Vehicular Battery Charger, Charging System, and Method for Transmitting Battery Charge Threshold Information. A true and correct copy of the '844 Patent is attached as **Exhibit 3** to this Complaint.

113.    ChargeLogic owns all rights, title, and interest in and to the '844 Patent, including the right to assert all causes of action under the '844 Patent and the right to any remedies for the infringement of the '844 Patent.

114.    Tesla has directly infringed, and continues to directly infringe, the '844 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, without authorization, one or more products that practice various claims of the '844 Patent, literally or under the doctrine of equivalents (the Accused Products). At a minimum, such Accused Products include all devices that infringe the claims of the '844 Patent. This includes products like the Accused Tesla Vehicles, as well as any other similar products.

115.    As detailed below, the Accused Products are configured by Tesla to practice every claim of at least claim 1 of the '844 Patent literally or under the doctrine of equivalents.[25] Further, the identified components and functionality are representative of the components and functionality present in all Accused Products.

116.    The '844 Patent generally relates to technology that controls charging of EV batteries. The claims of the '844 Patent, including claim 1, recite novel and inventive systems and methods to manage, actively monitor, control, and provide notifications relating to EV battery

---

[25] This description is illustrative and is not intended to be an exhaustive or limiting explanation of every manner in which each Accused Product infringes the '844 Patent.

45

charging.

117.    For example, claim 1 of the '844 Patent recites:

1. A system for charging a battery of a vehicle, the system comprising:

a controller electrically coupled to a battery charger, the controller configured to:

compare, during charging of the battery with the battery charger, a level of charge of the battery to a predetermined threshold level of charge, and

responsive to the level of charge of the battery reaching the predetermined threshold level of charge, wirelessly send, before the charging of the battery is complete, at least one signal via a transmitter, the at least one signal indicative of the predetermined threshold level of charge of the battery.

118.    The claims of the '844 Patent, including claim 1, are directed to patent-eligible subject matter. The claims are not directed to an abstract idea under the first step of the *Alice*/*Mayo* framework. The claims also recite an inventive concept that confirm the claims are drawn to a patent-eligible application under the second step of the framework.

119.    The '844 Patent claims provide a specific technical improvement to vehicular battery charging systems by enabling autonomous, threshold-triggered notifications to be wirelessly transmitted to a user's portable device during charging. *See, e.g.*, Ex. 3 at 21:61–22:61. The claimed system does not merely recite a generic concept of monitoring and notifying; it recites a specific ordered combination of technical components—including the electrically-coupled controller; real-time charge comparison, a wireless transmitter, and a portable controller configured to generate user-facing notifications—that together solve the specific technical problem of providing remote, real-time charging awareness to EV users without requiring their physical presence at the vehicle. *See, e.g.*, *id.* at 21:47–22:61.

120.    At the time of the invention disclosed in the '844 Patent, the claimed combination

of elements was unconventional and not well-understood or routine in the field. The claimed system integrates a controller electrically coupled to a battery charger that performs real-time comparison of battery charge levels against a predetermined threshold, wirelessly sends a signal indicative of the threshold level before charging is complete, and communicates with a portable controller to provide a notification to a user. This specific technical architecture—the combined elements—was not a well-understood, routine, or conventional activity. *See, e.g.*, Ex. 3 at 22:29–61.

121. The specification of the '844 Patent confirms that the claimed inventions represented a departure from and an improvement over the prior art; EVs were a nascent technology at the time. *See id.* Further, the prior art did not teach or suggest combining an electrically coupled controller, real-time charging, a wireless transmitter, and notifications via a portable controller. The claims of the '844 Patent recite a specific technological solution implemented through specific hardware and software components that were not available or conventional in 2008.

122. Each of the Accused Products practices every element of at least claim 1.

123. For example, each of the Accused Products includes and comprises a system for charging a battery of a vehicle. Accused Tesla Vehicles implement a battery charging system that incorporates and comprises a high-voltage battery pack, an onboard charger (OBC), an onboard Battery Management System (BMS), and charging control electronics and processors that charge a battery of the vehicle. For example, the Model 3 is equipped with an 11 kW AC on-board charger that converts external power to charge the battery. Further, Accused Tesla Vehicles also contain on-board charger (OBC) hardware and hardware control circuitry to regulate charging. For example, in the Accused Tesla Vehicles, firmware and/or software manages AC/DC charging, and

the OBC is controlled by the vehicle's firmware to manage AC/DC charging. The BMS is responsible for managing charging of the battery and provides, among other things, alerts related to the battery and detects changes in the vehicle's battery. Further, for example, Tesla provides external charging devices (Mobile Connector or Wall Connector) that interface with the OBC. For example, the external charging devices and vehicle connector provide AC power from an outlet so that the Tesla OBC may convert the power to DC to be stored in the vehicular battery—*i.e.*, to charge the battery of the vehicle. *See, e.g.*, D. Thai, *Tesla Model 3 & Y Home Charging Guide*, ZECar, https://zecar.com/reviews/tesla-model-3-and-y-home-charging-guide (Apr. 3, 2025); EVinventory, *Tesla Battery Management System (BMS) Calibration*, https://ev-inventory.com/guide/tesla-bms-calibration.php (last updated Apr. 10, 2024); Tesla Owner's Manual at 185, 232–33 https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026); EVexpert, *On-Board Charger*, https://www.evexpert.eu/eshop1/knowledge-center/on-board-charger?srsltid=AfmBOop7DZ9K0iy9IZObRJZAL2RM94MSUE4uhn_2fid3u50vNnyRCwvn (last visited Mar. 1, 2026); RevoluSun, *EV Charging*, https://idaho.revolusun.com/ev-charging/ (last visited Mar. 1, 2026); Tesla, Model 3 Owner's Manual: Electric Vehicle Components, https://www.tesla.com/ownersmanual/model3/en_us/GUID-8FA15856-1720-440F-838B-ACFBA8D7D608.html (last visited Mar. 1, 2026) (showing location of high-voltage battery); ZapMap, *Tesla Model 3 EV Charging Guide*, https://www.zapmap.com/ev-guides/model-charging/tesla-model-3/ (last visited Mar. 1, 2026); Tesla, *Onboard Charger*, https://www.tesla.com/support/charging/onboard-charger (last visited Mar. 1, 2026) (describing "onboard charger" capabilities).



When a Wall Connector or Mobile Connector plugs into the charge port it provides alternating current, also known as AC power, to your vehicle. Batteries store energy as direct current, also known as DC energy.

The onboard charger, which is built in your vehicle, handles this by converting the AC power into DC energy so that it can be stored in the battery.

124.     Further, each of the Accused Products includes and comprises a controller electrically coupled to a battery charger, including specific configurations as described below. For example, Accused Tesla Vehicles have an onboard battery charger built into the car, which is electrically coupled to and controlled by the vehicle's electronics. The Accused Tesla Vehicles also comprise and include a controller that controls vehicular battery charging and manages charging of the battery, including via an onboard Battery Management System (BMS) and charging control electronics and processors that monitor, manage, and transmit and receive data about vehicular charging (a Controller). For example, BMS actively manages the charging process for the battery. The BMS and associated control electronics are electrically connected to the charger and battery, measuring battery parameters and managing charging, including by commanding the charger to start, stop, or adjust power as needed. *See, e.g.*, Tesla, *Onboard Charger*, https://www.tesla.com/support/charging/onboard-charger (last visited Mar. 1, 2026)

(describing "onboard charger" capabilities); EVinventory, *Tesla Battery Management System (BMS) Calibration*, https://ev-inventory.com/guide/tesla-bms-calibration.php (last updated Apr. 10, 2024) ("(BMS) is responsible for looking after the battery").

125. Further, each of the Accused Products includes and comprises a controller configured to compare, during charging of the battery with the battery charger, a level of charge of the battery to a predetermined threshold level of charge. For example, Accused Tesla Vehicles allow users to set a predetermined threshold of charge, such as a charge limit, via the vehicle's in-car touchscreen display or Mobile App. On the in-car display and Mobile App, a charge slider is provided to set the desired charge percentage. Tesla provides "recommended daily and trip charging limits," which are predetermined threshold limits of charge, that are less than a full charge of the battery (*e.g.*, 80%). Accused Tesla Vehicles receive, via a charge slider and selected charge level, data indicative of a predetermined threshold level of charge. The data provided by the user via the "charge slider" is applied to charging sessions to manage charging of the battery and is received by the Controller. *See, e.g.*, Tesla Owner's Manual at 174–81, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026) (describing mobile app connectivity); Tesla, *Vehicle Controls | Tesla App*, https://www.tesla.com/support/videos/watch/vehicle-controls-tesla-app (last visited Mar. 1, 2026); EV Chargers, *Tesla Charging Tips*, https://ev-chargers.com/news/tesla-charging-tips/?srsltid=AfmBOopX1kZfsFIxopuuVM1deuWkijkaSJdpQ-GhhWXgtNfOhHJ5pco1 (Nov. 1, 2023).



126.   Further, the Controller, including the BMS, continuously monitors and compares the battery's state-of-charge relative to the charge limit during charging. For example, Accused Tesla Vehicles track charging process against the charge limit, and a user can see in the in-car display or in the Mobile App the current state of charging. For example, if the charge limit is set to 80%, the car will charge to ~80% and the Controller will reduce and terminate charging, concluding the charging cycle upon the battery's percentage reaching the target charge level. *See, e.g.,* EV Chargers, *Tesla Charging Tips*, https://ev-chargers.com/news/tesla-charging-tips/?srsltid=AfmBOopX1kZfsFIxopuuVM1deuWkijkaSJdpQ-GhhWXgtNfOhHJ5pco1 (Nov. 1, 2023); Tesla, *Charge*, https://www.tesla.com/charge (last visited Mar. 1, 2026).

127.   Further, each of the Accused Products includes and comprises a controller configured to, responsive to the level of charge of the battery reaching the predetermined threshold level of charge, wirelessly send, before the charging of the battery is complete, at least one signal via a transmitter. For example, each Accused Tesla Vehicle's Controller sends wireless notifications to the user as soon as a target charge level is reached (and even shortly before completion). Accused Tesla Vehicles are equipped with cellular data transmitters, and the Mobile

51

App provides real-time charging status and alerts. For example, when an Accused Tesla Vehicle is charging, a user's smartphone will receive a push notification before charging is entirely done informing them that the car has reached its set limit or is about to. This wireless signal is sent via the Accused Tesla Vehicle's built-in transmitter (a cellular LTE/5G or WiFi modem). For example, the Mobile App provides notifications for "Charging Started," "Charging Interrupted," and "Charging Complete." *See, e.g.*, Tesla Owner's Manual at 54, 174–81, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026) (describing mobile app connectivity); Tesla, Model Y Owner's Manual: Connectivity | Mobile App, https://www.tesla.com/ownersmanual/modely/en_th/GUID-F6E2CD5E-F226-4167-AC48-BD021D1FFDAB.html (last visited Mar. 1, 2026) ("View and customize notifications you receive under the Settings tab, such as . . . charging updates"); Tesla Motors Club, *Charging Status in Tesla App*, https://teslamotorsclub.com/tmc/threads/charging-status-in-tesla-app.327629/ (May 22, 2024); Not a Tesla App, *Tesla App 4.13 Release Notes*, https://www.notateslaapp.com/tesla-app-updates/version/4.13/release-notes (Sept. 16, 2022); Tesla, *Vehicle Controls | Tesla App*, https://www.tesla.com/support/videos/watch/vehicle-controls-tesla-app (last visited Mar. 1, 2026); EV Chargers, *Tesla Charging Tips*, https://ev-chargers.com/news/tesla-charging-tips/?srsltid=AfmBOopX1kZfsFIxopuuVM1deuWkijkaSJdpQ-GhhWXgtNfOhHJ5pco1 (Nov. 1, 2023); Tesla, *Charge*, https://www.tesla.com/charge (last visited Mar. 1, 2026).





128.    Further, the Accused Products comprise and include a controller configured to, responsive to the level of charge of the battery reaching the predetermined threshold level of charge, wirelessly send, before the charging of the battery is complete, at least one signal via a transmitter, the at least one signal indicative of the predetermined threshold level of charge of the battery. For example, the charging notifications and displays described above convey the battery's charge-level status, as measured against the user's pre-set threshold charge level. Further, for example, Mobile App notifications include information about the charge state as of the alert. For

53

example, the Live Charge Status feature on iPhone shows the car's battery graphic and the charge percentage in real time. In the image, the app displays a battery meter with a green portion and a grayed-out portion up to the set limit, and a blacked-out portion for the battery capacity above the set limit, along with text like "*Charge: 27%*," indicative of the predetermined threshold level of charge of the battery. When charging finishes (at the user's threshold), the Mobile App will push a "Charging Complete" notification, which informs the user that the set charge level has been achieved. Tesla's official guidance says the app notifies again when charging is complete. *See, e.g.*, Tesla, Model Y Owner's Manual: Charging Instructions, https://www.tesla.com/ownersmanual/modely/en_th/GUID-F6E2CD5E-F226-4167-AC48-BD021D1FFDAB.html (last visited Mar. 1, 2026); A. Connell, *Two Months with a Tesla Model S: Insights and Discoveries*, https://www.andrewconnell.com/blog/two-months-with-a-tesla-model-s-85d-our-first-1-200-mile-road-trip/ (last visited Mar. 1, 2026); Not a Tesla App, *Tesla Adds Real-Time Charging Alerts with iOS Live Activities*, https://www.notateslaapp.com/news/2757/tesla-adds-real-time-charging-alerts-with-ios-live-activities-support (May 28, 2025).



129.    Tesla thus directly infringed, and continues to directly infringe, each element of at least claim 1 of the '844 Patent by, *e.g.*, without authorization, operating, using (including internal use and testing), offering for sale, and selling, and continuing to operate, use (including internal

use and testing), offer for sale, and sell, the Accused Products, which infringe at least claim 1 of the '844 Patent.

130. As described above, Tesla had pre-suit knowledge of the '844 Patent; Tesla had actual knowledge of the '567 Patent since August 15, 2024, and because the '844 Patent cites to and is in the same patent family as the '567 Patent, Tesla had pre-suit knowledge of the '844 Patent. At a minimum, Tesla had knowledge of the '844 Patent no later than the filing of this Complaint.

131. Since having notice of the '844 Patent, Tesla has indirectly infringed and continues to indirectly infringe the '844 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including agent-subsidiaries, affiliates, partners, service providers, resellers, customers, and/or end users, in this District and elsewhere in the United States, through the dissemination and maintenance of the Accused Products, the dissemination and maintenance of compatible charging stations, and the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, technical information, and/or app releases and updates relating to the Accused Products with knowledge and the specific intent that its efforts will result in the direct infringement of the '844 Patent.

132. For example, Tesla took active steps to encourage end users to use charging control mechanisms in the Accused Products in the United States in a manner Tesla knows will directly infringe each element of at least claim 1 of the '844 Patent, including by selling the Accused Products and encouraging users to use the charging control mechanisms in the Accused Products, despite knowing of the '844 Patent and the fact that usage of the charging control mechanisms will infringe the '844 Patent.

133.    Such active steps include, for example, advertising and marketing Tesla's EVs, marketing and selling of devices capable of or intended for use in controlling charging, publishing manuals and promotional literature describing and instructing users to use those charging control mechanisms, and offering support and technical assistance to its customers that encourage use of the charging control mechanisms in ways that will directly infringe at least claim 1 of the '844 Patent.

134.    Tesla undertook and continues to undertake the above-identified active steps after receiving notice of the '844 Patent and how those steps induce infringement of the '844 Patent.

135.    Tesla's acts of infringement have caused and continue to cause damage to ChargeLogic, and ChargeLogic is entitled to recover from Tesla the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '844 Patent, together with interest and costs as fixed by the Court.

136.    Tesla has had actual notice of ChargeLogic's '844 Patent at least as early as August 15, 2024, as a family member of the '567 Patent. Tesla received constructive notice of the '844 Patent at least as early as when the U.S. Patent and Trademark Office issued the '844 Patent. Tesla performed and continues to perform the acts that constitute direct and/or indirect infringement, with knowledge or willful blindness that the acts would constitute direct and/or indirect infringement of the '844 Patent.

### COUNT 4—INFRINGEMENT OF THE '996 PATENT

137.    ChargeLogic repeats and realleges all preceding paragraphs, as if fully set forth herein.

138.    On November 22, 2022, the United States Patent and Trademark Office duly and

legally issued the '996 Patent entitled Vehicular Battery Charger, Charging System, and Method. A true and correct copy of the '996 Patent is attached as **Exhibit 4** to this Complaint.

139.    ChargeLogic owns all rights, title, and interest in and to the '996 Patent, including the right to assert all causes of action under the '996 Patent and the right to any remedies for the infringement of the '996 Patent.

140.    Tesla has directly infringed, and continues to directly infringe, the '996 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, without authorization, one or more products that practice various claims of the '996 Patent, literally or under the doctrine of equivalents (the Accused Products). At a minimum, such Accused Products include all devices that infringe the claims of the '996 Patent. This includes products like the Cybercab, which on information and belief Tesla is currently testing at its Gigafactory in Austin, Texas,[26] as well as any other Tesla products that include Tesla's wireless charging and vehicle positioning system as described herein.

141.    As detailed below, Tesla practices every claim of at least claim 15 of the '996 Patent literally or under the doctrine of equivalents.[27]

142.    The '996 Patent generally relates to technology that controls charging of EV batteries. The claims of the '996 Patent, including claim 15, recite novel and inventive systems and methods of charging, including but not limited to wireless charging of EV batteries.

143.    For example, claim 15 of the '996 Patent recites:

> 15. A method of charging a battery of a vehicle, the method comprising:

[26] *See, e.g.*, BASENOR, *Tesla Cybercab Testing Ramps Hard: 16+ Units Leaving Giga Texas* (Mar. 11, 2026), https://www.basenor.com/blogs/news/tesla-cybercab-testing-ramps-hard-16-units-leaving-giga-texas (last visited Mar. 18, 2026).
[27] This description is illustrative and is not intended to be an exhaustive or limiting explanation of every manner in which Tesla infringes the '996 Patent.

detecting a positional relationship between a first core on the vehicle and a second core in a location exterior to the vehicle, the first and second cores enabling induction charging of the battery when sufficiently aligned with respect to one another;

detecting an alignment of the first core with respect to the second core within a predetermined threshold based at least in part on the positional relationship between the first core and the second core; and

in response detecting the alignment of the first core with respect to the second core, enabling a user control displayed on a display for controlling the induction charging of the battery.

144.     The claims of the '996 Patent, including claim 15, are directed to patent-eligible subject matter. The claims are not directed to an abstract idea under the first step of the *Alice*/*Mayo* framework. The claims also recite an inventive concept that confirm the claims are drawn to a patent-eligible application under the second step of the framework.

145.     At the time of the invention disclosed in the '996 Patent, the claimed combination of elements was unconventional and not well-understood or routine in the field. The claimed method requires detecting a positional relationship between a first core on the vehicle and a second core exterior to the vehicle (enabling induction charging when aligned), detecting alignment within a predetermined threshold based on that positional relationship, and in response to detecting alignment, enabling a display for controlling induction charging. This specific combination of elements was inventive and technologically specific. *See, e.g.*, Ex. 4 at 4:33–46, 33:19–35:11.

146.     The '996 Patent claims provide a specific technical improvement to inductive EV charging. Inductive (wireless) charging requires alignment between the power supply core and power receiving core. *See* Ex. 4 at 33:43–46. In the EV context, the problem of alignment is heightened as the alignment must occur between vehicle-mounted and ground-mounted charging pads. Centimeter-level precision is difficult to obtain with large devices like vehicles; drivers lack line-of-sight visibility to align the charging elements; and unlike smaller handheld devices with

relatively uniform sizes, EVs have different ride heights, wheelbase lengths, or other physical features that make the process of matching the pads more difficult. *See id.* at 34:28–35:3. The consequences of misalignment are significant: misalignment causes inefficient energy transfer, overheating, and charging failure. *See id.* at 33:43–48. At the same time, wireless charging represents a substantial benefit to drivers by removing certain frictions associated with EVs; a user no longer needs to plug and unplug a cord to the vehicle. *See id.* at 34:64–35:3. The claimed method addresses this specific challenge through an integrated detection and user-interface solution: the system detects the positional relationship between the two cores, determines when alignment is within an acceptable threshold, and then enables initiation of inductive charging. *Id.* at 4:33–46, 33:19–35:11. This is not a generic concept of aligning objects or of using a wireless charger, but a technological method for ensuring safe and efficient inductive EV charging through conditional controls and the display.

147. The claimed inventions represented a departure from and an improvement over the prior art. At the time of the invention, the inductive EV charging solution in the patent was not commercially available, and the technical architecture described in the claims was not well-understood, routine, or conventional.

148. Tesla practices every element of at least claim 15.

149. For example, Tesla implements wireless vehicle charging, which on information and belief includes the wireless charging and vehicle positioning system of the Cybercab, that "include[s] a UWB [ultra-wideband] transceiver contained in a vehicle as well as UWB transceivers contained in an outdoor ground pad. . . . For wireless charging applications, a vehicle pad ('VP') is installed on the undercarriage of the vehicles and includes the power receiving coil, as well as electronics necessary for communications with a ground pad to control the wireless

charging. . . . Charging takes place when the EV is positioned optimally over the charging system (conductive, wireless or undercarriage) so that the charging system is aligned. . . ." Through this charging system, Tesla implements "vehicle positioning" to "enable[] additional technologies such as wireless charging and underbody conductive charging" to charge a battery of a vehicle. *See* Request of Tesla, Inc. for Waiver at 3–5, 8, F.C.C. ET Docket No. 25-101 (July 9, 2024) (*hereinafter*    "Tesla    Waiver    Request"),    *available*    *at* https://www.fcc.gov/ecfs/document/107092291610026/1.

150.    Further, for example, Tesla's wireless charging and vehicle positioning system enables wireless charging of the vehicle when the vehicle's charging pad and a ground pad are aligned    together.    *See,    e.g.*,    Tesla,    *Cybercab    Wireless    Charging*,    YouTube, https://www.youtube.com/watch?v=sDUOky6TYtw (Oct. 21, 2024):



*See also, e.g.*, D. Zlatev, *Tesla Robotaxi boasts 93% wireless charging efficiency on omnidirectional pad*, NotebookCheck (Oct. 20, 2024), https://www.notebookcheck.net/Tesla-Robotaxi-boasts-93-wireless-charging-efficiency-on-omnidirectional-pad.904787.0.html;    Tesla (@Tesla), X (Oct. 19, 2024 4:05 p.m.), https://x.com/Tesla/status/1847745953857524119:



151.    Further, Tesla's wireless charging and vehicle positioning system detects a positional relationship between a first core on the vehicle and a second core in a location exterior to the vehicle, the first and second cores enabling induction charging of the battery when sufficiently aligned with respect to one another. For example, the Accused Products incorporate a first core on the vehicle (the VP described above) and a second core in a location exterior to the vehicle, such as an outdoor or on-floor ground pad. For example, Tesla's charging system "include[s] a UWB transceiver contained in a vehicle as well as UWB transceivers contained in an outdoor ground pad. . . . The ground pad uses a set of UWB sensors to position the vehicle by enabling precise positioning (such as required for EV battery pack charging applications) between the pad and the EV." *See* Tesla Waiver Request at 3–5.

152.    Further, for example, Tesla's wireless charging and vehicle positioning system uses "UWB positioning" "to ensure proper alignment before the charging can begin and to prevent intermittent or incomplete connection, or in the case of the wireless charging application,

inefficient coupling of the charging pads. . . . The EV will use the UWB ranging information to determine the relative position/location of the ground pad which will then be used to guide the EV operator to align the EV to the pad." *Id.* at 4–5. Through its charging system, Tesla also enables inductive charging of the battery upon alignment of the first and second cores. For example, "[c]harging takes place when the EV is positioned optimally over the charging system (conductive, wireless or undercarriage) so that the charging system is aligned. . . . The UWB distance measurements between the pad and EV are analyzed by the EV to provide instructions to the EV operator to align the pad and vehicle before commencing a charging session." *Id.* As another example, "UWB sessions . . . shall continue only until the vehicle is properly positioned over the pad." *Id.* at 11; *see also* Tesla, *Cybercab Wireless Charging*, YouTube, https://www.youtube.com/watch?v=sDUOky6TYtw (Oct. 21, 2024).

153.    Further, Tesla through its wireless charging and vehicle positioning system detects an alignment of the first core with respect to the second core within a predetermined threshold based at least in part on the positional relationship between the first core and the second core. For example, "UWB positioning is used to ensure proper alignment before the charging can begin and to prevent intermittent or incomplete connection, or in the case of the wireless charging application, inefficient coupling of the charging pads. . . . The EV will use the UWB ranging information to determine the relative position/location of the ground pad which will then be used to guide the EV operator to align the EV to the pad." *See* Tesla Waiver Request at 4–5. "Charging takes place when the EV is positioned optimally over the charging system (conductive, wireless or undercarriage) so that the charging system is aligned." *Id.* "UWB sessions . . . shall continue only until the vehicle is properly positioned over the pad." *Id.* at 11; *see also* A. Isaac, *Tesla Wins FCC Approval for Wireless Cybercab Charging*, Tesla Hubs,

https://teslahubs.com/blogs/tips/tesla-wins-fcc-approval-for-wireless-cybercab-charging (Feb. 19, 2026).

154. Further, Tesla through its wireless charging and vehicle positioning system, in response to detecting the alignment of the first core with respect to the second core, enables a user control displayed on a display for controlling the induction charging of the battery. For example, Tesla's charging system detects whether the vehicle pad is aligned with the ground pad, notifies an operator of the alignment, and enables induction charging and control. "Charging takes place when the EV is positioned optimally over the charging system (conductive, wireless or undercarriage) so that the charging system is aligned." Tesla Waiver Request at 4. "The EV will use the UWB ranging information to determine the relative position/location of the ground pad which will then be used to guide the EV operator to align the EV to the pad. The operator will be notified once the EV and ground pad are properly aligned." *Id.* at 5. "The UWB distance measurements between the pad and EV are analyzed by the EV to provide instructions to the EV operator to align the pad and vehicle before commencing a charging session. These instructions are displayed on the vehicle screen for the operator to precisely align the vehicle over the pad." *Id.* "UWB sessions . . . shall continue only until the vehicle is properly positioned over the pad." *Id.* at 11.

155. Tesla thus directly infringed, and continues to directly infringe, each element of at least claim 15 of the '996 Patent by, *e.g.*, without authorization, operating, using (including internal use and testing), offering for sale, and selling, and continuing to operate, use (including internal use and testing), offer for sale, and sell, the Accused Products, which infringe at least claim 15 of the '996 Patent.

156. As described above, Tesla had pre-suit knowledge of the '996 Patent; Tesla had

actual knowledge of the '567 Patent since August 15, 2024, and because the '996 Patent cites to and is in the same patent family as the '567 Patent, Tesla had pre-suit knowledge of the '996 Patent. At a minimum, Tesla had knowledge of the '996 Patent no later than the filing of this Complaint.

157. Since having notice of the '996 Patent, Tesla has indirectly infringed and continues to indirectly infringe the '996 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including agent-subsidiaries, affiliates, partners, service providers, resellers, customers, and/or end users, in this District and elsewhere in the United States, through the dissemination and maintenance of the Accused Products, the dissemination and maintenance of compatible charging stations, and the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, technical information, and/or app releases and updates relating to the Accused Products with knowledge and the specific intent that its efforts will result in the direct infringement of the '996 Patent.

158. Tesla's acts of infringement have caused and continue to cause damage to ChargeLogic, and ChargeLogic is entitled to recover from Tesla the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '996 Patent, together with interest and costs as fixed by the Court.

159. Tesla has had actual notice of ChargeLogic's '996 Patent at least as early as August 15, 2024, as a family member of the '567 Patent. Tesla received constructive notice of the '996 Patent at least as early as when the U.S. Patent and Trademark Office issued the '996 Patent. Tesla performed and continues to perform the acts that constitute direct and/or indirect infringement,

with knowledge or willful blindness that the acts would constitute direct and/or indirect infringement of the '996 Patent.

**COUNT 5—INFRINGEMENT OF THE '010 PATENT**

160. ChargeLogic repeats and realleges all preceding paragraphs, as if fully set forth herein.

161. On February 20, 2024, the United States Patent and Trademark Office duly and legally issued the '010 Patent entitled Vehicular Battery Charger, Charging System, and Method with In-Vehicle Display of Charge Time. A true and correct copy of the '010 Patent is attached as **Exhibit 5** to this Complaint.

162. ChargeLogic owns all rights, title, and interest in and to the '010 Patent, including the right to assert all causes of action under the '010 Patent and the right to any remedies for the infringement of the '010 Patent.

163. Tesla has directly infringed, and continues to directly infringe, the '010 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, without authorization, one or more products that practice various claims of the '010 Patent, literally or under the doctrine of equivalents (the Accused Products). At a minimum, such Accused Products include all devices that infringe the claims of the '010 Patent. This includes products like the Accused Tesla Vehicles, as well as any other similar products.

164. As detailed below, the Accused Products are configured by Tesla to practice every claim of at least claim 1 of the '010 Patent literally or under the doctrine of equivalents.[28] Further,

---

[28] This description is illustrative and is not intended to be an exhaustive or limiting explanation of every manner in which each Accused Product infringes the '010 Patent.

65

the identified components and functionality are representative of the components and functionality present in all Accused Products.

165.    The '010 Patent generally relates to technology that controls charging of EV batteries. The claims of the '010 Patent, including claim 1, recite novel and inventive systems and methods calculate and continuously update the calculation of charge timing.

166.    For example, claim 1 of the '010 Patent recites:

1. A vehicle charger for charging a battery of a vehicle, the vehicle charger comprising:

a display mounted within the vehicle; and

a controller onboard the vehicle and coupled to the display, the controller configured to

begin an active charging session of the battery based on a programmed manner of charge and at least one condition, the programmed manner of charge starting charging of the battery in response to the at least one condition being met,

calculate an amount of time required to charge the battery,

display, during the active charging session but before starting charging of the battery according to the at least one condition, the amount of time upon the display, and

repeatedly update the amount of time upon the display during the active charging session, including during the active charging session but before starting charging of the battery according to the at least one condition.

167.    The claims of the '010 Patent, including claim 1, are directed to patent-eligible subject matter. The claims are not directed to an abstract idea under the first step of the *Alice/Mayo* framework. The claims also recite an inventive concept that confirms the claims are drawn to a patent-eligible application under the second step of the framework.

168.    At the time of the invention disclosed in the '010 Patent, the specific combination of claimed elements was unconventional and not well-understood or routine. For example, as

explained above, EV charging available in 2008 was unintelligent. *See, e.g.*, Ex. 5 at 1:22–60. The claimed vehicle charger includes a display mounted within the vehicle and an onboard controller, where the controller is configured to: begin an active charging session based on a programmed manner of charge and at least one condition; calculate the time required to charge the battery; display the calculated time during the charging session but before starting charging; and update the time display during the session. The concept of proactively calculating and displaying charge-time information to the user during a pre-charge waiting period—and updating that information in real time—was not conventional, well-understood, or routine. *See, e.g.*, Ex. 5 at 1:22–60, 12:8–14:13, 16:1–20, 17:17–28, 41:18–28.

169.    The '010 Patent provides a specific technical improvement to vehicular battery charging systems. Rather than leaving the user uninformed during the waiting period before condition-based charging begins (e.g., while awaiting off-peak electricity rates), the claimed system calculates and continuously displays—on an in-vehicle display—the estimated time required to charge the battery. This real-time, pre-charge time estimation and display address a specific problem: providing EV users with predictive charging estimates before and during active charging, which enables informed decision-making about departure timing and charge management. *See, e.g.*, *id.* The claims recite a specific technical implementation, not a generic concept of displaying information.

170.    The specification of the '010 Patent confirms that the claimed inventions represented a departure from and an improvement over the prior art. For example, the specification explains the challenges of adopting EV charging at home. *See, e.g.*, Ex. 5 at 1:22–60, 16:1–20, 17:17–28. Further, the prior art did not teach or suggest the specific combination of elements claimed in the '010 Patent. This specific solution was not available or conventional in 2008.

171.   Each of the Accused Products practices every element of at least claim 1.

172.   For example, each of the Accused Products includes and comprises a vehicle charger for charging a battery of a vehicle.

173.   For example, Accused Tesla Vehicles incorporate an onboard charger (OBC) and telematics enabling wireless connectivity (cellular/WiFi) to remote computers and user devices, wherein the OBC handles storage of direct current (DC) energy in part by converting alternating current (AC) power into DC energy so that it can be stored in the vehicle's battery. *See, e.g.*, Tesla, *Onboard Charger*, https://www.tesla.com/support/charging/onboard-charger (last visited Mar. 1, 2026) (describing "onboard charger" capabilities); Tesla, Model 3 Owner's Manual: Electric Vehicle Components, https://www.tesla.com/ownersmanual/model3/en_us/GUID-8FA15856-1720-440F-838B-ACFBA8D7D608.html (last visited Mar. 1, 2026) (showing location of high-voltage battery):



When a Wall Connector or Mobile Connector plugs into the charge port it provides alternating current, also known as AC power, to your vehicle. Batteries store energy as direct current, also known as DC energy.

The onboard charger, which is built in your vehicle, handles this by converting the AC power into DC energy so that it can be stored in the battery.

68

174.    Further, the Accused Products comprise and include a vehicle charger comprising a display mounted within the vehicle. For example, Accused Tesla Vehicles have integrated in-vehicle displays in the cabin. *See, e.g.*, Tesla Owner's Manual at 6–10, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026).

175.    Further, the Accused Products comprise and include a vehicle charger comprising a controller onboard the vehicle and coupled to the display, the controller configured including as described below. For example, Accused Tesla Vehicles include an interactive display that shows charging information, such as scheduled charge times, and "start at" and "end by times" for the in-car charging schedule and coupled to the controller. *See, e.g.*, Tesla Owner's Manual at 181, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026) (describing using the touchscreen or Mobile App to access and use scheduled charging features); Tesla, *Onboard Charger*, https://www.tesla.com/support/charging/onboard-charger (last visited Mar. 1, 2026) (describing "onboard charger" capabilities);  *see also* M. Merano, *Tesla Highlights Advantages of its Scheduled Departure Feature*, TeslaRati, https://www.teslarati.com/tesla-highlights-scheduled-departure-advantages-video/ (Feb. 13, 2023).

176.    Further, the Accused Products include and comprise such a controller configured to begin an active charging session of the battery based on a programmed manner of charge and at least one condition, the programmed manner of charge starting charging of the battery in response to the at least one condition being met. For example, Accused Tesla Vehicles support scheduled (programmed) charging based on user-set conditions (like time of day). Tesla's Scheduled Charging/Departure feature allows a user to program a start or departure time; the vehicle's

69

controller then determines whether that condition is met to begin charging. Further, for example, the Mobile App and in-car controls allow the user to set a "Start Charging at" a specific time or "Charge by" target time; the vehicle will begin the charging session in a programmed manner to meet that condition. *See, e.g.*, Tesla, Model Y Owner's Manual: Scheduled Precondition and Charge, https://www.tesla.com/ownersmanual/modely/en_us/GUID-76995CEC-6402-4BFF-99FA-CEFA36E64A19.html (last visited Mar. 1, 2026).

177.   Further, the Accused Products include and comprise such a controller configured to calculate an amount of time required to charge the battery. For example, the in-car display and Mobile App for Accused Tesla Vehicles provide an estimated charge time remaining while the car is charging, which is continuously updated during the charging session. Accused Tesla Vehicles compute this estimate using current battery state and charging power. *See, e.g.*, Tesla, Model Y Owner's Manual: Charging Instructions, https://www.tesla.com/ownersmanual/modely/en_us/GUID-BEE08D47-0CE0-4BDD-83F2-9854FB3D578F.html (last visited Mar. 1, 2026); *see also, e.g.*, Tesla Motors Club, *Charging Status in Tesla App*, https://teslamotorsclub.com/tmc/threads/charging-status-in-tesla-app.327629/ (May 22, 2024); Not a Tesla App, *Tesla Adds Real-Time Charging Alerts with iOS Live Activities*, https://www.notateslaapp.com/news/2757/tesla-adds-real-time-charging-alerts-with-ios-live-activities-support (May 28, 2025).



178. Further, the Accused Products include and comprise such a controller configured to display, during the active charging session but before starting charging of the battery according to the at least one condition, the amount of time upon the display. For example, Accused Tesla Vehicles provide the estimated charge time remaining on the display during a scheduled charge session, including before the charging begins. For example, when an Accused Tesla Vehicle is plugged in with a future "Start charge" time set, the in-car display will show an estimate of the expected completion time or duration. *See, e.g.*, Tesla, Model Y Owner's Manual: Charging Instructions, https://www.tesla.com/ownersmanual/modely/en_us/GUID-BEE08D47-0CE0-4BDD-83F2-9854FB3D578F.html (last visited Mar. 1, 2026).



179. Further, the Accused Products include and comprise such a controller configured to repeatedly update the amount of time upon the display during the active charging session, including during the active charging session but before starting charging of the battery according to the at least one condition. For example, the charge time display in Accused Tesla Vehicles and the Mobile App updates continuously in real time, both while charging and in any waiting period beforehand. *See, e.g.*, *id.*

71

**During Charging**

During charging, the charge port light (the Tesla "T" logo) pulses green, and the touchscreen displays real-time charging status. The frequency at which the green charge port light pulses slows down as the charge level approaches full. When charging is complete, the light stops pulsing and is solid green.

180. Tesla thus directly infringed, and continues to directly infringe, each element of at least claim 1 of the '010 Patent by, *e.g.*, without authorization, operating, using (including internal use and testing), offering for sale, and selling, and continuing to operate, use (including internal use and testing), offer for sale, and sell, the Accused Products, which infringe at least claim 1 of the '010 Patent.

181. As described above, Tesla had pre-suit knowledge of the '010 Patent; Tesla had actual knowledge of the '567 Patent since August 15, 2024, and because the '010 Patent cites to and is in the same patent family as the '567 Patent, Tesla had pre-suit knowledge of the '010 Patent. At a minimum, Tesla had knowledge of the '010 Patent no later than the filing of this Complaint.

182. Since having notice of the '010 Patent, Tesla has indirectly infringed and continues to indirectly infringe the '010 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including agent-subsidiaries, affiliates, partners, service providers, resellers, customers, and/or end users, in this District and elsewhere in the United States, through the dissemination and maintenance of the Accused Products, the dissemination and maintenance of compatible charging stations, and the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, technical information, and/or app releases and updates relating to the Accused Products with knowledge and the specific intent that its efforts will result in the direct infringement of the '010 Patent.

183. For example, Tesla took active steps to encourage end users to use charging control

72

mechanisms in the Accused Products in the United States in a manner Tesla knows will directly infringe each element of at least claim 1 of the '010 Patent, including by selling the Accused Products and encouraging users to use the charging control mechanisms in the Accused Products, despite knowing of the '010 Patent and the fact that usage of the charging control mechanisms will infringe the '010 Patent.

184. Such active steps include, for example, advertising and marketing Tesla's EVs, marketing and selling of devices capable of or intended for use in controlling charging, publishing manuals and promotional literature describing and instructing users to use those charging control mechanisms, and offering support and technical assistance to its customers that encourage use of the charging control mechanisms in ways that will directly infringe at least claim 1 of the '010 Patent.

185. Tesla undertook and continues to undertake the above-identified active steps after receiving notice of the '010 Patent and how those steps induce infringement of the '010 Patent.

186. Tesla's acts of infringement have caused and continue to cause damage to ChargeLogic, and ChargeLogic is entitled to recover from Tesla the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '010 Patent, together with interest and costs as fixed by the Court.

187. Tesla has had actual notice of ChargeLogic's '010 Patent at least as early as August 15, 2024, as a family member of the '567 Patent. Tesla received constructive notice of the '010 Patent at least as early as when the U.S. Patent and Trademark Office issued the '010 Patent. Tesla performed and continues to perform the acts that constitute direct and/or indirect infringement, with knowledge or willful blindness that the acts would constitute direct and/or indirect

73

infringement of the '010 Patent.

### COUNT 6—INFRINGEMENT OF THE '011 PATENT

188.    ChargeLogic repeats and realleges all preceding paragraphs, as if fully set forth herein.

189.    On February 20, 2024, the United States Patent and Trademark Office duly and legally issued the '011 Patent entitled Vehicular Battery Charger, Charging System, and Method Displaying Charge Information. A true and correct copy of the '011 Patent is attached as **Exhibit 6** to this Complaint.

190.    ChargeLogic owns all rights, title, and interest in and to the '011 Patent, including the right to assert all causes of action under the '011 Patent and the right to any remedies for the infringement of the '011 Patent.

191.    Tesla has directly infringed, and continues to directly infringe, the '011 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, without authorization, one or more products that practice various claims of the '011 Patent, literally or under the doctrine of equivalents (the Accused Products). At a minimum, such Accused Products include all devices that infringe the claims of the '011 Patent. This includes products like the Accused Tesla Vehicles, as well as any other similar products.

192.    As detailed below, the Accused Products are configured by Tesla to practice every claim of at least claim 1 of the '011 Patent literally or under the doctrine of equivalents.[29] Further, the identified components and functionality are representative of the components and functionality

---

[29] This description is illustrative and is not intended to be an exhaustive or limiting explanation of every manner in which each Accused Product infringes the '011 Patent.

present in all Accused Products.

193.   The '011 Patent generally relates to technology that controls charging of EV batteries. The claims of the '011 Patent, including claim 1, recite novel and inventive systems and methods of remote charging initiation and control, and calculation and notification of charge timing.

194.   For example, claim 1 of the '011 Patent recites:

1. A system for charging a battery of a vehicle with a vehicular battery charger, the system comprising:

a controller configured to:

establish wireless communication with a portable controller of a user remote from the vehicle and the vehicular battery charger,

receive a wireless signal from the portable controller,

responsive to receiving the wireless signal, supply electricity from a source of power to the battery of the vehicle with the vehicular battery charger, and

during charging of the battery with the vehicular battery charger:

repeatedly receive at least one signal indicative of a level of charge of the battery,

repeatedly estimate, based at least in part upon the at least one signal, an amount of time remaining to charge the battery, and

repeatedly display on a display mounted within the vehicle and within view of a user seated in the vehicle:

information indicative of the amount of time remaining to charge the battery based at least in part upon the estimating step, and

information indicative of the level of charge of the battery.

195.   The claims of the '011 Patent, including claim 1, are directed to patent-eligible

subject matter. The claims are not directed to an abstract idea under the first step of the *Alice*/*Mayo* framework. The claims also recite an inventive concept that confirm the claims are drawn to a patent-eligible application under the second step of the framework.

196.    The '011 Patent claims provide a specific technical improvement to vehicular battery charging systems. The claimed system enables a user to wirelessly initiate charging from a remote portable controller and then provides the user with continuously updated real-time information about estimated charging time and current charge level throughout the charging process. This addressed the specific technical problem of providing comprehensive, real-time charging feedback to users who may initiate charging remotely and return to the vehicle at various points during the session. The claims do not merely recite the abstract concept of displaying charging information; they recite a specific system involving wireless remote initiation, repeated signal-based charge estimation, and repeated display of both time-remaining and charge-level information. *See, e.g.*, Ex. 6 at 13:1–28, 21:48–55; 22:27–59.

197.    At the time of the invention, the specific combination of elements claimed in the '011 Patent was unconventional and not well-understood or routine. The claimed system integrates a controller that establishes wireless communication with a portable controller of a remote user; the ability to receive a wireless signal from the portable controller and, in response, supply electricity to the vehicle battery; and during charging, the controller repeatedly receives signals of the charge level and estimates remaining time to charge to display that information on an in-vehicle display. *See, e.g.*, *id.* This specific combination of elements was not conventional, well-understood, or routine at the time of the invention; as explained above, the Apple App Store had only been released in July 2008.

198.    The claimed combination of wireless remote-initiated charging with continuous in-

76

vehicle charge-time and charge-level display represented a significant technological advance over the prior art. At the time of the invention, no prior art system provided the combined features of the invention. The claims of the '011 Patent recite a specific technological solution implemented through specific hardware and software components that were not available or conventional in 2008. *See, e.g.*, Ex. 6 at 1:22–60, 21:67–22:26.

199.    Each of the Accused Products practices every element of at least claim 1.

200.    For example, each of the Accused Products includes and comprises a system for charging a battery of a vehicle with a vehicular battery charger. For example, Accused Tesla Vehicles incorporate an onboard charger (OBC), wherein the OBC handles storage of direct current (DC) energy in part by converting alternating current (AC) power into DC energy so that it can be stored in the vehicle's battery. For example, Accused Tesla Vehicles use components such as the onboard charger, the battery, and the charge port, as an in-vehicle charging system. *See, e.g.*, Tesla, *Onboard Charger*, https://www.tesla.com/support/charging/onboard-charger (last visited Mar. 1, 2026) (describing "onboard charger" capabilities); Tesla, Model 3 Owner's Manual: Electric Vehicle Components, https://www.tesla.com/ownersmanual/model3/en_us/GUID-8FA15856-1720-440F-838B-ACFBA8D7D608.html (last visited Mar. 1, 2026) (showing location of high-voltage battery):



When a Wall Connector or Mobile Connector plugs into the charge port it provides alternating current, also known as AC power, to your vehicle. Batteries store energy as direct current, also known as DC energy.

The onboard charger, which is built in your vehicle, handles this by converting the AC power into DC energy so that it can be stored in the battery.

201. Further, for example, Tesla provides external charging devices (Mobile Connector or Wall Connector) that interface with the OBC. For example, the external charging devices and vehicle connector provide AC power from an outlet so that the Tesla OBC may convert the power to DC to be stored in the vehicular battery—*i.e.*, to charge the battery of the vehicle. *See, e.g.*, *id.*; D. Thai, *Tesla Model 3 & Y Home Charging Guide*, ZECar, https://zecar.com/reviews/tesla-model-3-and-y-home-charging-guide (Apr. 3, 2025); RevoluSun, *EV Charging*, https://idaho.revolusun.com/ev-charging/ (last visited Mar. 1, 2026).

202. Further, for example, the Accused Products comprise and include a controller that controls vehicular battery charging and manages charging of the battery, such as via an onboard Battery Management System (BMS) and charging control electronics and processors that monitor, manage, and transmit and receive data about vehicular charging (a Controller). This BMS and associated charge control modules and processors control charge rate, monitor battery state, and

78

execute charging schedules. *See, e.g.*, EVinventory, *Tesla Battery Management System (BMS) Calibration*, https://ev-inventory.com/guide/tesla-bms-calibration.php (last updated Apr. 10, 2024); Tesla Owner's Manual at 185, 232–33 https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026).

203.    Further, as discussed above, for example, Accused Tesla Vehicles also contain on-board charger hardware and hardware control circuitry to regulate charging. In the Accused Tesla Vehicles, firmware and/or software manages AC/DC charging, and the OBC is controlled in part by such firmware and/or software to manage AC/DC charging.

204.    Further, for example, the Accused Products include and comprise such a controller configured to establish wireless communication with a portable controller of a user remote from the vehicle and the vehicular battery charger. For example, Accused Tesla Vehicles have built-in cellular modems with SIMs and Wi-Fi that maintain internet connectivity for remote monitoring and control. The Mobile App, enabled and accessible through a user's computer/mobile devices, is a portable controller through which a user can communicate with the car remotely and perform functions like checking charging status. *See, e.g.*, Tesla Owner's Manual at 54, 176–81, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026) (describing mobile app connectivity):

79



**Mobile App**

The Tesla mobile app allows you to communicate with Model 3 remotely using your iPhone® or Android™ phone.

**NOTE:** The information below may not represent an exhaustive list of the functions available on the Tesla mobile app. To ensure access to new and improved features, download updated versions of the mobile app as they become available.

### To Use the Mobile App

To set up the Tesla mobile app to communicate with your Model 3:

1. Download the Tesla mobile app to your phone.
2. Log in to the Tesla mobile app by entering your Tesla account credentials.
3. Enable mobile access to your Model 3 by touching **Controls > Safety > Allow Mobile Access**.
4. Turn your phone's Bluetooth setting **ON** and ensure that Bluetooth is turned on within your phone's global settings for the Tesla mobile app. For example, on your phone, navigate to Settings, choose the Tesla mobile app, and ensure the Bluetooth setting is enabled.

Your phone and vehicle must both be actively connected to cellular service or Wi-Fi for the mobile app to communicate with your vehicle remotely. Tesla recommends that you always have a functional physical key readily available if parking in an area with limited or absent cellular service, such as an indoor parking garage.

### Overview

When both your phone and the vehicle have internet service, the Tesla mobile app's home screen allows you to:

- Lock or unlock your vehicle.
- Enable or disable the heating or air conditioning and monitor the cabin climate.
- Check your vehicle's charging information. Charging details also appear when a charging cable is plugged in.
- Open or close the charge port.
  **NOTE:** Twisting red lines next to the Battery icon indicate that the Battery is actively heating up (including while charging or preparing to charge).
- See where your vehicle is located.
- View your vehicle's estimated range.
- Open the front trunk.
- View your vehicle's odometer, VIN, and current software version.

205.    Accused Tesla Vehicles also connect to Tesla's servers for features like live telemetry and updates. For example, Tesla's support documentation explains that all vehicles have Standard Connectivity for 8 years, enabling remote services via Tesla's network. This connectivity allows the vehicle's charging system to be wirelessly accessed and controlled, including while remote from the vehicle and the on-board vehicular battery charger. Such connectivity provides

80

wireless, remote access to and control of the vehicle's charging system and establishes wireless communication between a controller of the vehicular battery charger and a portable controller (Mobile App). *See, e.g.*, Tesla, *Connectivity*, https://www.tesla.com/support/connectivity (last visited Mar. 1, 2026).

206. Further, the Accused Products include and comprise such a controller configured to receive a wireless signal from the portable controller. For example, as described above, the Mobile App provides remote access to and control of the vehicle's charging system. *Id.*

207. Further, the Accused Products include and comprise such a controller configured to, responsive to receiving the wireless signal, supply electricity from a source of power to the battery of the vehicle with the vehicular battery charger. For example, as described above, the Mobile App provides on-screen controls for charging separate from the in-vehicle display. For example, the user can open the Mobile App and set up Scheduled Departure and off-peak charging, as well as use and deploy the "Start Charging" and "Stop Charging" buttons; any of these send a wireless signal to the Accused Tesla Vehicle that is received by the controller. For example, when a user taps the "Start Charging" button, the Controller receives a wireless signal from the Mobile App to change the charging state. *See, e.g.*, Tesla Owner's Manual at 181 https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026); *see also* M. Merano, *Tesla Highlights Advantages of its Scheduled Departure Feature*, TeslaRati, https://www.teslarati.com/tesla-highlights-scheduled-departure-advantages-video/ (Feb. 13, 2023); Tesla, *Schedule Your Departure*, YouTube, https://www.youtube.com/watch?v=IfCgYIAtugU (Feb. 13, 2023); Tesla, *Tesla Model 3 Quick Video | Charge Status Screen*, YouTube, https://www.youtube.com/watch?v=7A6Dh2LHBbo (Jan. 19, 2020); Tesla, *Home Charging*, https://www.tesla.com/home-charging (last visited Mar.

1, 2026); Tesla Owners Documentation at 216, *available at* https://static.nhtsa.gov/odi/tsbs/2023/MC-10247399-9999.pdf (last visited Mar. 1, 2026).

208.    Further, the Accused Products include and comprise such a controller configured to, during charging of the battery with the vehicular battery charger: repeatedly receive at least one signal indicative of a level of charge of the battery. For example, the controller continuously monitors the battery's state-of-charge during charging by receiving a signal with the current battery charge level and charge status. For example, a user can see in the in-car display or in the Mobile App the current level of charge as monitored by the controller. In addition, for example, the Accused Tesla Vehicles send wireless notifications to the Portable Controller during the charging of the battery and before the charging of the battery is complete. For example, when an Accused Tesla Vehicle is charging, the Mobile App will receive a push notification, generated and wirelessly transmitted from the Accused Tesla Vehicle, before charging is complete stating that the vehicle is about to or has reached its set limit. *See, e.g.*, Tesla Owner's Manual at 54, 174–81, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026); Tesla, *Charge*, https://www.tesla.com/charge (last visited Mar. 1, 2026).





209.    Further, the Accused Products include and comprise such a controller configured to, during charging of the battery with the vehicular battery charger: repeatedly estimate, based at least in part upon the at least one signal, an amount of time remaining to charge the battery. For example, the in-car display and Mobile App for Accused Tesla Vehicles provide an estimated charge time remaining while the car is charging, which is continuously (repeatedly) updated during the charging session. Accused Tesla Vehicles compute this estimate using current battery state and charging power. *See, e.g.*, Tesla, Model Y Owner's Manual: Charging Instructions, https://www.tesla.com/ownersmanual/modely/en_us/GUID-BEE08D47-0CE0-4BDD-83F2-9854FB3D578F.html (last visited Mar. 1, 2026); *see also, e.g.*, Tesla Motors Club, *Charging Status in Tesla App*, https://teslamotorsclub.com/tmc/threads/charging-status-in-tesla-app.327629/ (May 22, 2024); Not a Tesla App, *Tesla Adds Real-Time Charging Alerts with iOS Live Activities*, https://www.notateslaapp.com/news/2757/tesla-adds-real-time-charging-alerts-with-ios-live-activities-support (May 28, 2025).



210.    Further, the Accused Products include and comprise such a controller configured to, during charging of the battery with the vehicular battery charger: repeatedly display on a display mounted within the vehicle and within view of a user seated in the vehicle: information indicative of the amount of time remaining to charge the battery based at least in part upon the estimating step, and information indicative of the level of charge of the battery. For example, Accused Tesla Vehicles have integrated in-vehicle displays in the cabin visible to a seated user. Accused Tesla Vehicles provide the estimated charge time remaining on the display during a charge session, including an estimate of the expected completion time or duration, and the current charge status of the vehicle. This information is repeatedly displayed on the in-cabin display during the active charging session and updates continuously in real time. *See, e.g.*, Tesla Owner's Manual at 6–10, https://www.tesla.com/ownersmanual/model3/en_ph/Owners_Manual.pdf (last updated Feb. 3, 2026).    *See,    e.g.*,    Tesla,    Model    Y    Owner's    Manual:    Charging    Instructions, https://www.tesla.com/ownersmanual/modely/en_us/GUID-BEE08D47-0CE0-4BDD-83F2-9854FB3D578F.html (last visited Mar. 1, 2026).

84



211.    Tesla has thus directly infringed, and continues to directly infringe, each element of at least claim 1 of the '011 Patent by, *e.g.*, without authorization, operating, using (including internal use and testing), offering for sale, and selling, and continuing to operate, use (including internal use and testing), offer for sale, and sell, the Accused Products, which infringe at least claim 1 of the '011 Patent.

212.    As described above, Tesla had pre-suit knowledge of the '011 Patent; Tesla had actual knowledge of the '567 Patent since August 15, 2024, and because the '011 Patent cites to and is in the same patent family as the '567 Patent, Tesla had pre-suit knowledge of the '011 Patent. At a minimum, Tesla had knowledge of the '011 Patent no later than the filing of this Complaint.

213.    Since having notice of the '011 Patent, Tesla has indirectly infringed and continues to indirectly infringe the '011 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including agent-subsidiaries, affiliates, partners, service providers, resellers, customers, and/or end users, in this District and elsewhere in the United States, through the dissemination and maintenance of the Accused Products, the dissemination and maintenance of compatible charging stations, and the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product

manuals, technical information, and/or app releases and updates relating to the Accused Products with knowledge and the specific intent that its efforts will result in the direct infringement of the '011 Patent.

214. For example, Tesla took active steps to encourage end users to use charging control mechanisms in the Accused Products in the United States in a manner Tesla knows will directly infringe each element of at least claim 1 of the '011 Patent, including by selling the Accused Products and encouraging users to use the charging control mechanisms in the Accused Products, despite knowing of the '011 Patent and the fact that usage of the charging control mechanisms will infringe the '011 Patent.

215. Such active steps include, for example, advertising and marketing Tesla's EVs, marketing and selling of devices capable of or intended for use in controlling charging, publishing manuals and promotional literature describing and instructing users to use those charging control mechanisms, and offering support and technical assistance to its customers that encourage use of the charging control mechanisms in ways that will directly infringe at least claim 1 of the '011 Patent.

216. Tesla undertook and continues to undertake the above-identified active steps after receiving notice of the '011 Patent and how those steps induce infringement of the '011 Patent.

217. Tesla's acts of infringement have caused and continue to cause damage to ChargeLogic, and ChargeLogic is entitled to recover from Tesla the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '011 Patent, together with interest and costs as fixed by the Court.

218. Tesla has had actual notice of ChargeLogic's '011 Patent at least as early as August

86

15, 2024, as a family member of the '567 Patent. Tesla received constructive notice of the '011 Patent at least as early as when the U.S. Patent and Trademark Office issued the '011 Patent. Tesla performed and continues to perform the acts that constitute direct and/or indirect infringement, with knowledge or willful blindness that the acts would constitute direct and/or indirect infringement of the '011 Patent.

## DEMAND FOR JURY TRIAL

219. Plaintiff demands a jury trial of all issues so triable under Federal Rule of Civil Procedure 38.

## FEES AND COSTS

220. To the extent that Tesla's willful and deliberate infringement or litigation conduct supports a finding that this is an "exceptional case," an award of attorneys' fees and costs to ChargeLogic is justified pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, ChargeLogic prays for relief against Tesla as follows:

a. Entry of judgment declaring that Tesla has infringed the Asserted Patents, contributed to the infringement of the Asserted Patents, and/or induced the infringement of the Asserted Patents;

b. Entry of judgment declaring that Defendant's infringement of the Asserted Patents is willful;

c. An order awarding damages sufficient to compensate ChargeLogic for damages arising out of this infringement of the Asserted Patents, as well as enhanced damages pursuant to 35 U.S.C. § 284, and supplemental damages for any continuing post-verdict infringement through entry of the final judgment with an accounting as needed, but in no event less than a reasonable royalty, including supplemental damages post-verdict,

together with pre-judgment and post-judgment interest and costs;

d.  An order awarding a compulsory ongoing royalty;

e.  An injunction permanently enjoining Tesla, its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons or entities from infringing, contributing to the infringement of, or inducing infringement of the Asserted Patents;

f.  Entry of judgment declaring that this case is exceptional and awarding Plaintiff its costs and reasonable attorney fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

g.  Such other and further relief as the Court deems just and proper.

Dated: March 23, 2026

Respectfully submitted,

*/s/ Mark D. Siegmund*
Steven Seigel
Washington Bar No. 53960
Ben Manne (*Pro Hac Vice* app. forthcoming)
Washington Bar. No. 54537
**SUSMAN GODFREY LLP**
401 Union Street, Suite 3000
Seattle, WA 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
sseigel@susmangodfrey.com
bmanne@susmangodfrey.com

Megan E. Griffith
Texas Bar No. 24122748
Shawn Blackburn (*Pro Hac Vice* app. forthcoming)
Texas Bar No. 24089989
**SUSMAN GODFREY LLP**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
mgriffith@susmangodfrey.com
sblackburn@susmangodfrey.com

Mark D. Siegmund, TX Bar No. 24117055
Shuya "Grace" Yang, TX Bar No. 24144144
**CHERRY JOHNSON SIEGMUND JAMES PC**
7901 Fish Pond Rd., 2nd Floor
Waco, Texas 76710
Telephone: (254) 732-2242
Facsimile: (866) 627-3509
msiegmund@cjsjlaw.com
gyang@cjsjlaw.com

***Attorneys for Plaintiff ChargeLogic LLC***

89